VILLAS OF LAKE JACKSON,
LTD., et al., Plaintiffs,

v.

LEON COUNTY, et al., Defendants.

No. 89–40247–WCS.

United States District Court,
N.D. Florida,
Tallahassee Division.

Feb. 10, 1995.

E.C. Deeno Kitchen, Esq., Kitchen, Judkins, Simpson & High, Tallahassee, FL, for plaintiffs.

Gregory T. Stewart, Esq., Gregory T. Stewart, P.A., John C. Cooper, Esq., Cooper,

Coppins & Monroe, Tallahassee, FL, for defendants.

### ORDER ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

SHERRILL, United States Magistrate Judge.

This case is before me for all further proceedings upon consent of the parties. Defendant, Leon County, moves for summary judgment for lack of standing accompanied by a memorandum. Docs. 308 and 309. Defendant also seeks summary judgment on the merits. Docs. 310 and 311.

Plaintiffs' responses are docs. 329 and 330, and doc. 338 is Defendant's reply. Defendant's depositions and affidavits are filed as doc. 313, County Commission meetings transcripts are filed as doc. 314, and corporate documents are filed as doc. 337. Plaintiff's affidavits in opposition are filed as doc. 331, and depositions and responses to interrogatories are filed as doc. 350. Numerous supplements have been filed. Docs. 318, 342, 345, 346, 385, and 386.

■ Summary judgment is governed by *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

477 U.S. at 322–23, 106 S.Ct. at 2552–53. As explained in *Celotex,* where the nonmoving party has the burden of proof on a dispositive issue, the moving party need not negate the claim. Rather, the burden on the moving party is to demonstrate an absence of evidence to support the nonmoving party's case. 477 U.S. at 325, 106 S.Ct. at 2554. If this occurs, the party upon whom the burden of

proof is imposed then must come forward with evidentiary material demonstrating a genuine issue of fact for trial. Reliance on the pleadings is inadequate.[1] 477 U.S. at 324, 106 S.Ct. at 2553.

The substantive law which underlies Plaintiffs' claims identifies which facts are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In the case at bar, the remaining federal claims are Count II, the arbitrary and capricious substantive due process claim, Count III, the claim of taking without just compensation substantive due process, and Count IV, the equal protection claim. Count V, a pendent state claim for inverse condemnation, also remains unresolved.

 A "genuine issue" of material fact requires that there be such evidence that a reasonable jury could return a verdict for the party bearing the burden of proof. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. In answering the question whether a reasonable jury could return a verdict for the party bearing the burden of proof, the court must apply the burden of proof imposed by law as to each issue. *Id.*, 477 U.S. at 252–255, 106 S.Ct. at 2512–13.

 Finally, the nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts to show that a reasonable jury could rule in his favor. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A scintilla of evidence is insufficient.

There must be such evidence presented by Plaintiffs that a jury could reasonably return a verdict for the party bearing the burden of proof. *Anderson v. Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. at 2512.[2] "[T]he evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party, and all reasonable doubts are resolved in his favor." *WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988). Implausible doubts are not resolved in favor of the non-moving party. *Earley v. Champion International Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990); *Matsushita*. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

## I. Collateral estoppel: *Pelham v. County of Leon*, 643 So.2d 1112 (Fla. 1st DCA 1994)

### A. Plaintiffs' claim of a due process property right created by state law equitable estoppel and Defendant's motion for summary judgment on the merits, doc. 310

Leon County initially contended that Plaintiffs were collaterally estopped by a judgment in state litigation as to whether the County is equitably estopped under state law from enforcing the changed Estate Zoning (single family) enacted in 1989. Doc. 311, p. 75. Plaintiffs responded that collateral estoppel does not apply because the issue in the state litigation was different (vesting against the Comprehensive Plan compared to the issue here, vesting under the prior RM–3 (multi-family) zoning). Plaintiffs also argued

---

1. Rule 56 so provides. When confronted with a properly supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Affidavits must set forth admissible facts based upon personal knowledge, and affirmatively show that the affiant is competent to testify to the matters asserted. Rule 56(e).

2. Conclusory factual allegations, even when under oath, are not sufficient to oppose a motion for summary judgment because a nonmoving party may not defeat a well supported motion by resting on the general allegations or denials of his pleadings. *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir.1984). *See also Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991), *cert. denied*, 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992) (nonmoving party may not defeat summary judgment by relying on conclusory allegations or legal conclusions); *Barfield v. Brierton*, 883 F.2d 923, 934 (11th Cir.1989) (repetition of conclusory allegations insufficient to defeat summary judgment). Conclusory allegations unsupported by specific facts have no probative value. *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985).

that collateral estoppel should not apply because principles of public policy dictate that the constitutional issues, which could not have been resolved in the administrative pioceeding, should be decided in this federal suit. Doc. 330, pp. 42–46. Thus, the parties briefed the issue of defensive use of collateral estoppel.

After these memoranda of law were filed, the circuit court decision upon which Leon County had premised its collateral estoppel defense was reversed by the First District Court of Appeal. *Pelham v. County of Leon,* 643 So.2d 1112 (Fla. 1st DCA 1994).[3] At oral argument, the parties reversed their respective positions on this question.

The order on the motion to dismiss discussed at length the relevance of the state law question of equitable estoppel. The threshold issue with respect to the substantive due process claims of Counts II and III is whether Plaintiffs had a property interest recognized by state law in either completing their multi-family development as intended in 1972 or as proposed and conditionally permitted in 1989. State law principles of equitable estoppel must be consulted to determine the existence of a state created property interest.

## 1. Legal principles governing collateral estoppel

■ A federal court must accord the same preclusive effect to a state court judgement as would the courts of that state. 28 U.S.C. § 1738; *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 415–416, 66 L.Ed.2d 308 (1980); *Migra v. Warren City School District,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). Accordingly, state law collateral estoppel principles must be examined to determine whether the judgment in the state case collaterally estops the Defendant in this case as to issues decided in that litigation. *Webb v. Ethridge,* 849 F.2d 546, 549 (11th Cir.1988).

■ In Florida, "collateral estoppel requires 'that the issue in the second action that is sought to be estopped from relitigation *be identical to necessary and material issues* resolved in the first suit.'" *Florida Department of Transportation v. Gary,* 513 So.2d 1338, 1340 (Fla. 1st DCA 1987), quoting *Seaboard Coast Line Railroad Company v. Cox,* 338 So.2d 190 (Fla.1976) (emphasis by the court). Stated another way, "it is essential to the application of collateral estoppel that the question common to both causes of action be actually adjudicated in the prior litigation." *Smith v. Perry,* 635 So.2d 1019, 1021 (Fla. 1st DCA 1994). As noted in *United Services Automobile Association v. Selz,* 637 So.2d 320 (4th DCA 1993), "[i]t is a violation of due process to collaterally estop a party who has never had an opportunity to present evidence and arguments on his claim or her claim." 637 So.2d at 322. Thus, the court held that "any doubt as to whether a particular issue was actually litigated in the previous action or whether appellant has had its day in court must be resolved in favor of appellant...." 637 So.2d at 324.[4]

*Carson v. Gibson,* 638 So.2d 79 (Fla. 2d DCA), *rev. denied,* 645 So.2d 451 (1994) is one example of how Florida courts apply the "identity of issue" principle of collateral estoppel. In prior litigation, Gibson had sued Carson to enforce a charging lien upon a settlement of a lawsuit in which Gibson had represented Carson. In defense, Carson claimed that Gibson had provided inadequate representation. The trial court rejected that defense, finding no malpractice or unethical behavior. Carson then attempted to sue Gibson for malpractice. The second court found Carson to be collaterally estopped. The court found that the same issue, claimed inadequate representation, was necessary and material to both cases. 638 So.2d at 81. It held that collateral estoppel applied defensively to Carson's malpractice claim even though "Carson has lost his right to a jury

3. Rehearing was denied on October 24, 1994. The status of any attempt to seek review in the Florida Supreme Court is not reflected in Westlaw as of the date of this order, and has not been reported by the parties. In any event, the decision is final for purposes of consideration by this court.

4. In the criminal to civil context, the Eleventh Circuit has similarly noted that a precondition to the application of collateral estoppel under Florida law is that the issue resolved in the earlier criminal case was "essential to the judgment" in that case. *Vazquez v. Metropolitan Dade County,* 968 F.2d 1101, 1108 (11th Cir.1992).

trial by litigating these issues in an earlier equitable proceeding." *Id.*

Another example is *Bergman v. Serns,* 560 So.2d 1201 (Fla. 3d DCA), *rev. denied,* 574 So.2d 143 (1990). In prior litigation, a court had held that Serns, son of the deceased, had exerted undue influence upon the deceased to obtain an *inter vivos* gift. The court had also found that the deceased had always intended to leave nothing to Serns by will. In the second suit, Bergman, daughter of the deceased, sought revocation of probate of a will executed by the deceased at the time of the *inter vivos* gift. The court in the second suit found in effect that the underlying issue of undue influence was the same as that previously determined adversely to Serns. Thus, collateral estoppel was available to Bergman to be used offensively against Serns.

*Munsey v. General Telephone Company of Florida,* 538 So.2d 1328 (Fla. 2d DCA 1989) is another example. Munsey sued General Telephone in federal court alleging denial of promotions due to her sex. In the course of dismissing her claims with respect to the position to which Munsey claimed entitlement to promotion, the district court found that Munsey had not been performing work comparable to males in her section as to that position. Munsey also had a pending suit in state court claiming denial of equal pay. In the equal pay suit, the state court held that the underlying issue of work comparability was essential to the equal pay claim. Since that issue had been determined adversely in the federal suit, the court found that Munsey was collaterally estopped to relitigate that dispositive question.

#### 2. The state court judgment here

The appellate court's judgment in *Pelham v. County of Leon,* 643 So.2d 1112 (Fla. 1st DCA 1994) sets forth the following descrip-

tion of the litigation before it. In 1990 Leon County adopted the Leon County Comprehensive Land Use Plan pursuant to § 163.3167, Fla.Stat. The court further found that "the County enacted Ordinance 90-31 to ensure that existing vested rights of Leon County property owners are not lost by operation of the plan's proscriptions." 643 So.2d at 1114. Ordinance 90-31 provided that for 120 days after July 16, 1990, a property owner could request a determination of whether he had vested rights to develop his land in a manner contrary to uses set forth in the plan. *Id.,* n. 2.

Thus, an application for a vested rights determination had to be filed within the 120 day period following July 16, 1990. The Ordinance provided that if the staff of the Tallahassee–Leon County Planning Department could not determine whether vested rights unequivocally existed, a hearing was to be conducted before a committee consisting of the county attorney, the director of planning, and the director of environmental management. "During this hearing, the applicant presents all of the evidence in support of the application." *Id.* An applicant unsatisfied with the results of this administrative determination was entitled to a "hearing" before an administrative hearing officer. The court found that the hearing officer "may receive additional evidence, as well as oral and written testimony (including cross-examination)...." [5] Judicial review in the circuit court was permitted by common law certiorari. 643 So.2d at 1114, n. 2. Such review was limited by common law and Fla.R.App.Pro. 9.030(c)(3) "to determining (1) whether procedural due process was accorded, (2) whether the essential requirements of law were observed, and (3) whether the administrative findings and judgment were supported by competent and substantial evidence." 643 So.2d at 1116.

**5.** The final administrative order of the state hearing officer, the order from which the appeal was taken to the circuit court, recites that the matter was before a hearing officer of the Florida Division of Administrative pursuant to § 120.65(9), Fla.Stat. (1989), which authorizes such hearing officers to hear matters by contract with a governmental entity, and pursuant to a contract with Leon County. Affidavit of David LaCroix, tab B. The contract and the county ordinance apparent-

ly conferred final authority upon the hearing officer since his order is styled a "final order." *Id.,* p. 1. Had the hearing been before the hearing officer pursuant to § 120.57, Fla.Stat., discovery pursuant to the Florida Rules of Civil Procedure governing circuit courts would have been permitted. It is unknown whether discovery was available at all to the parties in the state litigation.

The state court found as a matter of state law that Florida's common law of equitable estoppel was expressly incorporated into the Ordinance as the standard for determining whether a development right had vested with respect to the comprehensive plan. 643 So.2d at 1117. The court cited several "equitable estoppel" cases, many of which were relied upon by this court in the order on the motion to dismiss the fourth amended complaint. E.g., *Hollywood Beach Hotel Co. v. City of Hollywood*, 329 So.2d 10 (Fla.1976); *Franklin County v. Leisure Properties, Ltd.*, 430 So.2d 475 (Fla. 1st DCA), *pet. rev. denied*, 440 So.2d 352 (Fla. 1983); *Town of Largo v. Imperial Homes Corporation*, 309 So.2d 571 (Fla. 2d DCA 1975); *City of Lauderdale Lakes v. Corn*, 427 So.2d 239 (Fla. 4th DCA 1983). The elements of such "equitable estoppel" as established in these cases are:

(1) a property owner's good faith reliance

(2) on some act or omission of the government and

(3) a substantial change in position or the incurring of excessive obligations and expenses so that it would be highly inequitable and unjust to destroy the right he acquired.

In sum, the basic state law applied by the District Court of Appeal is relied upon by this court to determine whether Plaintiffs' have a due process property right.

As it adjudicated the claim of equitable estoppel, the state appellate court relied upon the following findings of fact:

During the county's process of reviewing and approving the 1972 rezoning application, Pelham disclosed to the county the conceptual uses intended for the overall 165–acre tract. A model depicting the concept plan for development, including the instant property, was also displayed prior to the final rezoning approval. In addition, Pelham informed the county that the project would be developed over an unspecified number of years in several different phases. During the process of review, the impact of drainage from the Bent Tree development on Lake Jackson became an issue. Accordingly, a storm water management system was designed for all of the property and Pelham agreed to complete this system before any development commenced on the project if the county granted rezoning.

643 So.2d at 1115. The court further recited as fact that:

Rezoning was ultimately approved in October 1972. . . .

Following the purchase of the tract in 1972, the drainage system was designed and built at a cost of $45,000, with a capacity larger than would have been necessary for the instant property alone. After this system was constructed, development of the project commenced. From 1975 to 1989, 128 acres of the original 165 acres were developed in approximately 14 segments, with the county consistently approving permits for the development of these segments. While certain changes to the original concept evolved over time, none were considered substantial enough to warrant denial of any permits.

*Id.*

On these facts, the state court held that

. . . it is sufficient to demonstrate, as Petitioners did here, that a substantial and not a de minimis portion of the overall expenditures facilitated and benefitted future phases of the planned project.

643 So.2d at 1119. The court also found that "[t]he present case is one of full disclosure to the county on the part of Petitioners." *Id.* It noted that

This observation is not inconsistent with the hearing officer's finding that in 1972 Pelham did not specifically indicate where the individual buildings would be located and how many would be built. For purposes of this decision, it was sufficient that Pelham readily revealed to the Board of County Commissioners his general plans for development of the entire project over a period of years.

*Id.*, n. 7. The court then concluded:

The fact that the county continuously issued permits for the unrestricted construction of the project over a period of 18 years with knowledge of expenditures for improvements to be made for the benefit

of the undeveloped as well as developed land is legally sufficient to establish that it would be grossly unfair to allow the county to deny Pelham and Equity Resources a vested right at the eleventh hour of the development of Phase II.

*Id.*

Finally, the District Court of Appeal was aware of this pending federal suit. The court said that the issue it decided was "limited to a determination of Petitioners' vested rights to the commercial zoning of the undeveloped 7.5 acre tract and to the Estate District zoning of the remaining undeveloped 30 acres." 643 So.2d at 1114, n. 3. The court observed that the down-zoning from multi-family to Estate District was not involved in the case before it, but was pending in the case at bar. *Id.*

■ The question before this court, therefore, is whether a Florida court would permit Plaintiffs to use the foregoing judgment as offensive collateral estoppel to establish their claim of equitable estoppel as it arises in this case. The pivotal question is whether the issue now before this court was an essential and critical issue that necessarily was determined in the course of the decision by the First District Court of Appeal.

The examples discussed above, where Florida courts have found collateral estoppel to be appropriate, uniformly satisfy this test. Inadequacy of attorney representation is the same issue whether arising in defense of a charging lien upon a settlement or in a suit for legal malpractice. *Carson v. Gibson.* Undue influence over a parent is the same issue whether arising with respect to an *inter vivos* gift or a testamentary gift if both gift and will were executed at the same time. *Bergman v. Serns.* Comparability of a person's actual work is the same issue whether arising in a suit alleging discriminatory refusal to promote to that position or denial of equal pay. *Munsey v. General Telephone Company of Florida.*

But equitable estoppel for development for estate zoning is not the same issue as equitable estoppel for multi-family development. The interplay of the "acts or omissions" of the County, and the "good faith reliance" of the property owner, the two essentials for common law equitable estoppel, may be entirely different depending upon the intensity of the development proposed. Multi-family development is a much more intense use of the land than a single family residence on two acres. Since the interplay between act or omission and good faith reliance may change depending upon the intensity of the development proposed, the equities, which is the fundamental underlying issue, may change as well. As the District Court of Appeal said in *Equity Resources, Inc., supra,* "the theory of estoppel amounts to nothing more than an application of the rules of fair play." 643 So.2d at 1119–1120. "If ... there is some doubt as to whether a litigant has had his day in court such doubt must be resolved in favor of the full consideration of the substantive issues of the litigation and against the rigid application of any principle that would defeat the ends of justice." *Smith v. Perry,* 635 So.2d 1019, 1021 (Fla. 1st DCA 1994), quoting *Seaboard Coast Line Railroad Co. v. Industrial Contracting Co.,* 260 So.2d 860, 864 (Fla. 4th DCA 1972).[6]

Here, the question of vested rights and good faith reliance for multi-family development was not on the table in the state courts. The state courts could not have known the equities between the parties so as to render fairness to both as to *that* issue. Since a state court would not permit Plaintiffs to rely on offensive collateral estoppel to preclude Defendants from their day in court as to this different issue, this court must do likewise.

**B. Collateral estoppel as to Plaintiffs' standing, Defendant's motion for summary judgment as to standing, docs. 308 and 309**

Defendant contends that Plaintiffs do not have standing to assert a vested development

---

**6.** The federal rule is the same. "Offensive collateral estoppel should be invoked to preclude litigation of an issue only if the party against whom collateral estoppel is urged has had a full and fair opportunity to litigate the identical issue in the earlier case." *Davis v. West Community Hos-*

*pital,* 786 F.2d 677, 682 (11th Cir.1986). "In an offensive collateral estoppel case a court must take special care to ensure that the defendant had a full and fair opportunity to litigate the issue in the other proceeding." *Matter of McWhorter,* 887 F.2d 1564, 1567 (11th Cir.1989).

rights claim based upon common law equitable estoppel because they were not owners of the property when the rezoning occurred in 1972. Doc. 309, p. 2. It is also argued that the numerous changes in title since 1972 severed the right to assert this claim since the acts or omissions of the governmental entity giving rise to common law equitable estoppel do not run with the land. *Id.*, p. 2, 9. It is also argued that since the claim of entitlement to a property right in the conditional 1989 permit depends entirely upon equitable estoppel arising from the rezoning in 1972, this break in title divests the Plaintiffs of standing to make any claim as to the 1989 permit.

Since the First District Court of Appeal's decision was filed after the parties briefed this issue, Plaintiffs did not raise offensive collateral estoppel as to standing in opposition to Defendant's motion for summary judgment. At oral argument the court invited argument as to this question.[7] Plaintiffs asserted the defense to summary judgment[8] and Defendant responded.[9]

As will be explained ahead, there are two distinct parcels of land at issue in this case, and these are identified in evidence as tracts 2 and 3. Defendant in this case has shown without genuine dispute that tract 2, which contains 9.15 acres, was owned by First Fidelity Corporation from August 5, 1974, until February 15, 1979, when Bent Tree, Ltd., received the property back in foreclosure.[10] First Fidelity Corporation has no connection with Plaintiffs, and none of the Plaintiffs in this case had any ownership interest in tract 2 between August 5, 1974, and February 15, 1979.

Another possible break in ownership of tract 2 concerns the period from 1980 to 1986. Plaintiff Pelham refers to tract 2 as the "first" tract in his affidavit. He states that Bent Tree transferred its interest in the parcel to Lake Jackson, Ltd., in 1980.[11] Pelham further avers that at this time, he was a limited partner of Lake Jackson, Ltd., and John Stocks was general partner. Pelham also avers that he retained an option to purchase a 40% interest in the property for $1.00.[12]

Defendant contends that Pelham's affidavit is false, and contradicted by his deposition testimony. Cited for this argument is page 5 of Defendant's memorandum on standing, doc. 309. Doc. 338, p. 4. The only reference to evidence as to this question in that document is in footnote 5.[13] Footnote 5 references the July 19, 1990, deposition of Pelham. In that deposition, Pelham was asked who were the limited partners of Lake Jackson, Ltd., in 1986 when he acquired all of the partnership interest. He responded that he, among others, was then a limited partner.[14] Later, Pelham explained that in 1980, when Lake Jackson, Ltd., was formed, he had a contract with Stocks, the general partner, "for a partnership interest in Lake Jackson, Ltd."[15] He explained:[16]

> Well, I never really gave up my interest in Lake Jackson, Limited. My contract provided that I would be a 40 percent limited partner in the transaction. For whatever reason John asked the partnership be set up and titled all in his name, but I had an option agreement for $1 to receive 40 percent interest in that partnership and it to be conveyed to me at any time.

Pelham said that he executed his option in 1986, and that is how he came back into direct ownership.[17]

---

7. Doc. 365, transcript of oral argument, pp. 14–15.

8. *Id.*, pp. 28–29.

9. *Id.*, pp. 30–32.

10. Doc. 309, p. 5.

11. Doc. 331, first Pelham aff., para. 26.

12. *Id.*, para. 28.

13. Exhibit 2 to the deposition is referenced, but no page numbers of the deposition are cited.

Exhibit 2 contains the original partnership agreement. Pelham was not a named limited partner when the partnership was first created.

14. Pelham dep., 7–19–90, p. 8.

15. *Id.*, p. 17.

16. *Id.*, p. 18.

17. *Id.*, p. 18.

Thus, the affidavit does not contradict the deposition testimony. It is apparent, however, that Pelham claims to have been a limited partner solely by virtue of his side agreement to purchase a 40% interest for a nominal amount. In summary, the facts as to Pelham's ownership interest to tract 2 from 1980 to 1986 are not disputed, but the legal effect of this arrangement is disputed.

Defendant has also shown without genuine dispute that tract 3, which contains 9.64 acres (less 1.49 acres used for The Lake Club Apartments), was owned by John Stocks from September 22, 1980, until June 12, 1986, and that none of the Plaintiffs had any ownership interest in tract 3 during this period. *Id.,* p. 6. It has also been shown without genuine dispute that Villas of Lake Jackson, Ltd., was not formed until October 1, 1987. *Id.,* p. 11. Pelham does not claim otherwise in his affidavits as to tract 3.[18]

In short, both tracts 2 and 3 were owned for a period of years by persons who are not Plaintiffs in this suit. There is no showing that during these periods of time, these persons were in privity with Plaintiffs. Were this court to write upon a clean slate, the legal effect of these significant breaks in ownership of both tracts 2 and 3 would be decisive in favor of Defendant as to their standing to make the claims found in counts II and III.

But collateral estoppel precludes relitigation of standing at least as to three of the current Plaintiffs. Plaintiffs Pelham and Equity Resources, Inc., two of the Plaintiffs in the case at bar, were the only parties in the state case in opposition to Leon County. The District Court of Appeal held as to Pelham that "[a]s one who purchased the property under a contract contingent on rezoning after the county granted the rezoning conditioned on the construction of a drainage system, Pelham clearly established sufficient acts of reliance." 643 So.2d at 1118. It further held that "Equity Resources is not an independent corporation, unrelated to Pelham, that obtained its interest in the land as

a stranger to the project. On the contrary, it is an entity that was created and controlled by Pelham to hold the land and consummate the development initiated by Pelham." *Id.* It also enumerated a number of independent acts by the County upon which Equity Resources had relied. *Id.* The court concluded that both Pelham and Equity Resources had standing under Florida law to claim that the County was equitably estopped as to estate zoning.

▬ Unlike the central equitable estoppel claim, the issue of standing to bring such a common law claim is identical to the standing question in the case at bar. As explained by the First District Court of Appeal in *Equity Resources, Inc.,* quoting from *Franklin County v. Leisure Properties, Ltd.,* 430 So.2d 475, 480 (Fla. 1st DCA), *rev. denied,* 440 So.2d 352 (Fla.1983), "a 'successor in interest' must show his own entitlement to the benefit of an estoppel and may not make such a showing by merely purchasing the property." 643 So.2d at 1118. Thus, that court used the same state law standard which this court must apply.

From a functional perspective the issue is also the same. It made no difference that the equitable estoppel claim only involved entitlement to vesting as to estate zoning rather than multi-family uses. The state court had to trace the same chain title for the same period of time as at issue in this case, and did so as to these two Plaintiffs.

Finally, while it is unclear whether discovery would have been permitted before the hearing officer who held the evidentiary hearing, the essential factual elements of Defendant's claim could have been gleaned by Leon County from public records, including land records at the county courthouse[19] and corporate records filed with the Secretary of State. Pelham testified at the evidentiary hearing, and he could have been required during that proceeding to explain the ownership history and the corporate history as to each parcel and each Plaintiff. Thus, it cannot be said that Defendant was not afforded

---

18. Doc. 331, first Pelham aff., para. 27 and 29.

19. Defendant's motion asserts, and Plaintiffs do not dispute, that every change of ownership of

the property was evidenced by a deed recorded in the official records of Leon County.

due process as to the litigation of the standing of these two Plaintiffs in the state suit.[20]

In summary, Defendant's motion for summary judgment as to the lack of standing of Pelham and Equity Resources, Inc., will be denied. The County is collaterally estopped by the results of the state court case.

The other two parties to this suit, Villas of Lake Jackson, Ltd., and Lake Jackson, Ltd., were not parties to the state litigation. Whether offensive collateral estoppel is available to these two parties is a question which raises difficult factual and legal issues under Florida law. In *Zeidwig v. Ward*, 548 So.2d 209 (Fla.1989), the Florida Supreme Court relaxed the mutuality of parties requirement for the *defensive* use of collateral estoppel against a plaintiff in a civil suit who had litigated and lost the identical issue in the criminal context. The court noted that in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the United States Supreme Court

> restrictively modified the mutuality requirement of the collateral estoppel doctrine in the *offensive* context. It found that collateral estoppel without mutuality could be used to the extent that the plaintiff could estop or bar his defendant opponent from raising or contesting an identical issue previously decided against that defendant. That Court held that offensive collateral estoppel could be invoked *only* if the plaintiff could not have been joined in the earlier case with reasonable ease.

548 So.2d at 212, citing *Parklane*, 439 U.S. at 332–333, 99 S.Ct. at 652–653 (emphasis by the court).

*Zeidwig* noted, however, that offensive use of collateral estoppel presents a different question, citing *Trucking Employees of North Jersey Welfare Fund, Inc. v. Romano*, 450 So.2d 843 (Fla.1984). In *Romano*, the Court considered and rejected a modification of the strict mutuality of parties requirement in the "offensive context." The defendants in the *Romano* case had been found guilty of fraud in a criminal case, and plaintiffs sought to use that finding offensively to establish liability in the civil case. *Romano* declined to recede from the "well-established rule in Florida" that "collateral estoppel may be asserted only when the identical issue has been litigated between the same parties or their privies." 450 So.2d at 844–845.

Thus, while it may soon change, the rule in Florida remains that of the *Romano* case, that the offensive use of collateral estoppel requires that the parties or their privies be identical. *See Stogniew v. McQueen*, 638 So.2d 114 (Fla. 2d DCA 1994) (so holding, but certifying the question to the Florida Supreme Court); *Asphalt Pavers, Inc. v. Department of Revenue*, 584 So.2d 55, 58 n. 6 (Fla. 1st DCA 1991).

Turning to the facts of this case, there is no dispute that Lake Jackson, Ltd., held title to tract 2 from September 30, 1980, until January 1, 1987, when it deeded the property to Equity Resources, Ltd.[21] As will be discussed ahead, there is no dispute that Pelham retained an option for $1 to purchase a 40% interest in Lake Jackson, Ltd., during this period. Thus, Lake Jackson, Ltd., was in privity with Pelham and has its own interests at stake as to tract 2.

Pelham has been the owner of the controlling stock in Equity Resources, Inc., since 1972, and served as President both in 1972 and was President in 1990.[22] Pelham has been the general partner of Lake Jackson, Ltd., since 1986.[23] Lake Jackson, Ltd., first came to own tract 3 on January 3, 1988, taking title from Equity Resources.[24] These undisputed facts sufficiently establish privity between Pelham, Equity Resources, and Lake Jackson, Ltd., as to tract 3.

---

**20.** The state appellate court, like this court, could only rule upon the record it had before it. Collateral estoppel applies notwithstanding the failure of the County to provide that court with the evidence sufficient to prove its claim of lack of standing since it had an opportunity to do so.

**21.** Doc. 309, p. 5 and n. 5.

**22.** Doc. 331, first Pelham aff., para. 2, 13, 14; Pelham dep., 7–19–90, p. 6.

**23.** Doc. 331, first Pelham aff., para. 29.

**24.** Doc. 309, p. 6. It lost the property in foreclosure on July 23, 1993. *Id.*

As a consequence of these findings, Lake Jackson, Ltd. is entitled to raise collateral estoppel as to standing in response to Defendant's motion for summary judgment as to both tract 2 and 3. It was in privity with the parties in *Pelham v. County of Leon,* 643 So.2d 1112 (Fla. 1st DCA 1994).

Relevant to collateral estoppel as to standing in favor of Lake Jackson, Ltd., the First District Court of Appeal found that

Since the 1972 purchase of the project, Pelham has continuously held an ownership interest either directly in the land or in all of the partnerships or corporate entities that have held title to the various portions of the land, including the property under construction.

\* \* \* \* \* \*

Equity Resources has held an ownership interest in all of the property involved in this case since 1987. Equity Resources acquired this interest from limited partnerships and other entities in which Pelham has held an interest and control.[4]

---

[4] ... With regard to the limited partnerships that have been used to develop the land, including the property at issue in this proceeding, either Richard Pelham or Equity Resources, Inc., has always been the general partner with one exception. From 1981–1986, while Lake Jackson, Ltd., had title to a part of the property at issue, Mr. Pelham was not the general partner of Lake Jackson, Ltd., but did retain a 40 percent interest in the partnership.

\* \* \* \* \* \*

In regard to Pelham's standing, the record confirms the hearing officer's finding that Pelham "individually and/or through entities in which Mr. Pelham has held a substantial ownership interest, has retained ownership interests in the property at issue from October 1972 to the date of the final hearing in this proceeding."

643 So.2d at 1115, 1117. These findings sweep with sufficient breadth to preclude relitigation in this court of standing as to Lake Jackson, Ltd.

It has not genuinely been disputed that Villas of Lake Jackson, Ltd., has never held any ownership interest in tracts 2 or 3.[25] Defendant has filed all of the record transactions showing that Villas of Lake Jackson, Ltd., is not in the chain of title as to either tract. Plaintiff Pelham avers that since 1986 there have been transfers of the property to "affiant's affiliated companies," and among those listed is Villas of Lake Jackson, Ltd., but he has presented no concrete evidence to support this generalized conclusion.[26] In the face of official record evidence, Plaintiffs have not created a genuine dispute of material fact by this statement.

Villas of Lake Jackson, Ltd., was formed on October 1, 1987, and Equity Resources, Inc., was both a general and a limited partner.[27] The purpose of Villas of Lake Jackson, Ltd., was to acquire and develop real and personal property, but the initial contributions to the partnership are listed as cash.[28] Equity Resources, Inc., came to own both tracts 2 and 3 by conveyances in 1987.[29]

There is no evidence, however, that Equity Resources, Inc., ever treated tracts 2 and 3 as assets of Villas of Lake Jackson, Ltd. It presumably held the land as a corporation, responsible to its stockholders. Its relationship to Villas of Lake Jackson, Ltd., as a general and limited partner, does not, without other evidence, give rise to any reasonable inference that Villas of Lake Jackson, Ltd., was in privity with Equity Resources, Inc., or Pelham, the two parties to the state litigation, with respect to development of tracts 2 and 3. Since Villas of Lake Jackson, Ltd. had no privity with the parties to the state litigation, it cannot use that judgment to raise collateral estoppel as to the question of its standing in the case at bar.

 As the First District Court of Appeal in *Equity Resources, Inc.* found, standing under Florida law to assert an equitable estoppel claim such as is a subsidiary

---

25. Doc. 309, pp. 5–6.

26. Doc. 331, first Pelham aff., para. 30.

27. Pelham dep., 7–19–90, exhibit 3; Doc. 331, first Pelham aff., para. 3.

28. *Id.*

29. Doc. 309, pp. 5–6 and cited record.

issue in this case requires a "legally cognizable interest," and such an interest is shown by "ownership of the property." 643 So.2d at 1117. Since Villas of Lake Jackson, Ltd., never owned the property, it lacks standing to assert entitlement to equitable estoppel. Standing to bring this subsidiary state claim is crucial to counts II and III.

Further, as to all counts this court lacks subject matter jurisdiction when it lacks a case or controversy as required by Article III of the Constitution. "In order to satisfy Art. III, the plaintiff must show that he personally has suffered some actual or threatened injury as a result of putatively illegal conduct of the defendant." *Gladstone, Realtors, et al. v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). Villas of Lake Jackson, Ltd., has failed to show that it has personally suffered injury as to any of the remaining counts.

For these reasons, Defendant's motion for summary judgment as to the standing of Villas of Lake Jackson, Ltd., will be granted and judgment entered in favor of Defendant as to this Plaintiff. In all other respects it will be denied.

## II. Whether Defendant is entitled to judgment as to Counts II and III upon Plaintiffs' claim of a due process property right arising from state law equitable estoppel

### A. Undisputed facts [30]

The land which is the subject of this lawsuit is contained in what are identified in documents in this case as tracts 2 and 3 southward of the dike along the shore of Lake Jackson in Leon County, Florida. The total acreage at issue for development for multi-family buildings is 12.96 acres.[31]

Tract 3 was part of a 40 acre parcel purchased in 1972 by Richard Pelham and Carl Pennington from Mr. and Mrs. W.H. Faulk, III. Tract 2, the western portion of the land at issue, was also purchased from Mr. and Mrs. Faulk as a part of a 125 acre parcel. The property was under contract initially to be conveyed to Equity Resources, Inc., but Equity conveyed its interest to Bent Tree, Ltd., as developer, and Bent Tree took title. Plaintiff Pelham owned stock in that corporation and was president, and he controlled and owned Bent Tree.[32] Thus, Pelham had an ownership interest in both tracts 2 and 3 at the time of the 1972 rezoning.

The contracts with the Faulks were conditioned upon rezoning of the 165 acres of land to permit multi-family development.[33] On August 1, 1972, the Faulks petitioned Leon County to have the property rezoned from Agricultural 2 to RM–3, a zoning classification that permitted multi-family dwellings.[34] Thus, though the Faulks applied for the rezoning, Leon County was fully aware during the rezoning process that Pelham, through his affiliated business organizations in existence at that time, had an ownership interest in the property and intended to develop it.[35]

In conjunction with this rezoning request, the Director of the Leon County Health Department, B.E. Bennison, M.D., wrote to the Executive Director of the County Planning Commission on September 12, 1972. Dr. Bennison suggested "serious consideration" of the rezoning because it appeared that "portions of the development adjacent to the lake are located in an area within the histori-

---

**30.** While there is much evidence in this case, the essential facts are not disputed. Where disputes of fact exist, this order will so note. In the absence of such note, it is the court's conclusion that the fact is not disputed.

**31.** Doc. 313, Wilkes aff., para. 5. Pelham testified that no buildings other than recreational amenities were planned for north of the dike which was marked with "x's" on ex. 2. Pelham dep., 1–27–94, pp. 13–14, 15–17 and ex. 2.

**32.** Doc. 331, Pelham aff., para. 13, 14, 21–23; Wilkes aff., para. 7.

**33.** Doc. 331, Pelham aff., para. 15 and 16.

**34.** Pelham aff., para. 17; Gregory aff., report of the Tallahassee–Leon County Planning Commission, 9–18–72. The Gregory affidavit was to have been filed as a part of doc. 313, but a copy was filed at the court's request as doc. 370 since the original could not be found.

**35.** Pelham aff., para. 18.

cally defined high water mark of the lake." [36] He also said that "[s]ince the general topography of the area is such that significant amounts of runoff from this development will find their way into Lake Jackson, it can be anticipated that such runoff will further contribute to the existing deterioration of water quality in the lake." [37] Finally, Dr. Bennison wrote that since water in Lake Jackson "may find its way into the aquifers flowing in a southerly direction," "the possibility of contaminating Tallahassee's water supply needs additional careful study." [38]

On September 14, 1972, the Planning Commission met. After several citizens voiced concern that multi-family construction would pollute the lake, it deferred a vote until September 18, 1972.[39]

On September 18, 1972, Pelham wrote a letter to Dr. Bennison, with copies to the members of the Planning Commission.[40] In the letter, as President of Equity Resources, Inc., Pelham said:

> \*　　\*　　\*　　\*　　\*　　\*
>
> In any event, we obviously do not intend to construct any improvements in any areas that might reasonably be expected to be subjected to flooding. All permanent improvements would be located substantially above the proposed hereinafter described holding ponds.
>
> Of obvious major concern to the public, as well as of great concern to your office and our company, is the runoff into Lake Jackson and the possible deterioration of water quality in the Lake.... These holding or siltation ponds would be of total area of 4 or 5 acres, and would have a berm at an elevation of approximately 100 feet....
>
> We would not anticipate construction of any buildings at an elevation of less than 105 feet. We are asking for rezoning to a RM–3 zoning classification. This is the only medium or high density residential zoning classification which has no height restrictions. With an unlimited height restriction, we, of course, can achieve the desired number of residential units with a minimum of land usage thereby substantially increasing the undisturbed green areas located within this portin [sic] of the development. In other words, ..., we would build vertically.

Pelham testified that the 105 foot elevation must be tied to a datum of sea level.[41] All of tract 3 and almost all of tract 2 is below the 105 foot contour line; only 0.43 acres is above the 105 foot line, and the majority of the land is below the 96.5 foot contour line.[42] The last high water mark for Lake Jackson is 96.53 feet.[43]

Pelham displayed a model of the proposed development before the Planning Commission.[44] The model was also shown to the County Commission.[45] The model depicts high-rise buildings on the land closest to the lake's edge.[46]

36. Gregory aff., para. 2(c)(i) and attachment.

37. Id.

38. Id.

39. Gregory aff., para. 2(d) and attachment.

40. Pelham dep., 7–19–90, pp. 90–91 and ex. 14.

41. Pelham dep., 8–30–90, p. 38.

42. Doc. 313, Wilkes aff., ex. 8. Wilkes avers in his supplemental affidavit that the amount of land above the 105 foot contour is .43 acres. Large copies of the maps attached to the Wilkes affidavit, which were presented to the court in oral argument, accompany this file.

43. Doc. 313, Alex Johnson dep., p. 57.

44. Pelham dep., 8–30–90, pp. 15, 50–51, and 72 and exs. 20 and 31.

45. Id., p. 51.

46. Id., exs. 20 and 31. On September 25, 1972, Pelham, as president of Equity Resources, Inc., wrote to the Board of County Commissioners further explaining the nature of the intended development if RM–3 zoning were granted. He again represented that "[w]e feel that it is necessary to construct buildings fronting the lake into the air rather than spreading many, many smaller buildings which would increase the run off from roof tops and asphaltic surfaces by many times." This statement was made concerning development "fronting the lake," but Pelham testified that this representation did not concern the Faulk application for rezoning; he said it concerned a parcel which already had office-residential (OR) zoning located on the other side of U.S. Highway 27 and north of Capital Circle. Pelham dep., 8–30–90, pp. 95–98 and ex. 16. Since a dispute of fact exists as to whether this statement of intent to build high-rise apart-

Pelham testified that he made essentially the same presentation to the County Commission as to the Planning Commission.[47] Further, he sent a letter to the County Commission (which will be discussed ahead) in which he stated that he was providing the Commissioners with a copy of the letter he sent to "the Health Department," that is, to Dr. Bennison. Plaintiffs present no contrary evidence. Thus, there is no genuine dispute of fact that the September 18, 1972, letter was presented to the County Commission in September 1972.[48]

Dr. Bennison withdrew his reservations about the rezoning based upon the representations in Pelham's letter.[49] But on September 18, 1972, the Planning Commission recommended that the rezoning be denied.[50] However, on October 17, 1972, the County granted the Faulks' application, rezoning that property to RM–3.[51] The minutes and the Ordinance are silent as to any exchange of promises as to the rezoning. Pelham states in his affidavit that the "Leon County Planning Commission and the Leon County Commission" assured him that if he purchased the property, he could develop the property "under a multi-family zoning classification."[52] Pelham states that Leon County "knew" at the time of rezoning that the planned development was for as many as 1,200 units on the two parcels, but the factual basis of that opinion is not stated.[53]

ments applied to the land at issue in this suit, the statement will be disregarded by the court for purposes of summary judgment. That a dispute of fact exists as to this statement does not create one about the representation of high-rise development in the September 18, 1972, letter, especially since the model presented to the County Commission depicted high rise buildings on what appear to be tracts 2 and 3.

47. Pelham dep., 8–30–90, p. 39.

48. Gregory aff., para. 2(c).

49. Pelham dep., 8–30–90, ex. 15.

50. Gregory aff., para. 2(e).

51. O'Neal aff. (4–27–91), minutes, and Ordinance 72–100.

52. Doc. 331, first Pelham aff., para. 20.

53. *Id.*, second Pelham aff., para. 11.

Pelham testified that he did not consider himself legally bound to construct the dike and holding pond after the property was rezoned.[54] The dike was created on the property, however, in late 1972 or early 1973.[55] Pelham states in his affidavit that Leon County knew that the storm water retention facilities were constructed to service Villas Phase I, Villas Phase II, the remaining multi-family development on the subject property, and the adjoining commercial property.[56] Pelham also states in his affidavit that in 1989 the storm water facility had sufficient capacity to handle storm water runoff for Villas Phases I–IV.[57]

On January 23, 1973, after hearing from many citizens, Leon County adopted Sedimentation Ordinance number 73–10.[58] On 20 occasions in the next seven years the Leon County Commission considered the issue of development in the Lake Jackson drainage basin and damage to the lake caused by storm water runoff.[59]

As to the development activities which occurred from 1972 forward, Plaintiff Pelham states in his first affidavit:[60]

24. That following the two purchases from the Faulks, affiant began an overall plan of development which included multi-family housing to be constructed on the property.

54. Pelham dep., 8–30–90, p. 40.

55. Johnson dep., pp. 22–23.

56. Doc. 331, second Pelham aff., para. 24–26.

57. *Id.*, para. 28.

58. O'Neal aff. (5–12–94), attachment A, Official Minute Book 33, pp. 841–850. Defendant refers to this as "BCC Book" in its memorandum of law, presumably for "Board of County Commissioners'" Book. To avoid confusion, this order will do likewise.

59. BCC Books 34, p. 851; 35, pp. 443, 450–451; 36, p. 425; 37, pp. 323 and 431; 39, pp. 242, 379, 410, 449, 452, 468–469; 41, pp. 575, 642, 647; 42, p. 74; 47, pp. 215, 236; 49, p. 463; 63, p. 160.

60. Doc. 331, ex. 1.

25. That the plan of development called for four or more Phases of multi-family construction, with infrastructure being constructed during Phase I that would service the entire development, including Phases II, III, and IV, as well as the adjoining property that was zoned commercial.

\* \* \* \* \* \*

34. That from 1972 to the present, except during the 1981–1982 time frame (and only because of the promises made by the Leon County Commission), development of the property has been continuous with the property being developed in approximately fourteen (14) distinct phases.

35. That during the development of the property, improvements have been made and expenditures incurred in reliance upon the right to develop the entire tract of subject property as multi-family housing.

36. That the storm water retention system was constructed to service all aspects of the Villas development, including Phases I, II, II, and IV, as well as the adjoining commercial property.

37. That the roads were designed and the streets dedicated to service all aspects of the Villas development, including Phases I, II, II, and IV, as well as the adjoining commercial property.

38. That in 1988, the Leon County Commission approved the proposed sewer facilities on the property and specifically addressed whether the sewer should be approved for only Phase I of the development. After considerable debate, the Leon County Commission approved the extension of the sewer system to service Phase I and subsequent Phases. Thereafter, affiant installed the sewer system to service not only Phase I, but the other phases as well.

39. That in 1989, Leon County approved a franchise agreement between EQUITY RESOURCES, INC. and Talquin Electric Co. for Talquin Electric Co. to provide utility service to the property and specifically approved the franchise agreement to include not only development of Villas Phase I, but also Phases II, III, and IV as well as the adjoining commercial property.

In his second affidavit [61] Pelham states:

15. That building permits were applied for and approved by Leon County for each phase of development on the subject property from 1975 to 1989.

16. That at the time Leon County approved building permits for the phases of development on the subject property from 1975 to 1989, Leon County knew that the improvements to the property were being constructed as part of a general plan of development which included multi-family housing on the subject property.

\* \* \* \* \* \*

20. That at the time Leon County approved utility extension permits, sewer line extensions, septic tanks, water lines, and underground electric lines for the phases of development on the subject property from 1975 to 1989, Leon County knew that such improvements were being constructed as part of a general plan of development which included the construction of multi-family housing on the subject property.

\* \* \* \* \* \*

22. That at the time the storm water retention facilities on the subject property were constructed [in 1972–1973], Leon County knew that such improvements were being constructed as part of a general plan of development which included the construction of multi-family housing on the subject property.

\* \* \* \* \* \*

28. That the storm water retention facility had sufficient capacity to handle storm water runoff from Villas Phase II, Villas Phase III, and Villas Phase IV.

On February 6, 1980, Robert N. Speidel, County Environmental Administrator, wrote to Russell J. Tagliareni, County Public Works Administrator. He said that a "proposed development" of Plaintiffs "shall be grandfathered from the provisions of 73–10, as amended, due to the actions of the Board

61. *Id.,* ex. 2.

of County Commissioners in 1972." [62] This statement, however, only concerned the *single* family units Plaintiffs constructed as Bent Tree III and IV, and related only to the compliance with the storm water requirements of Ordinance 73–10 with respect to the dike and holding pond.[63] The permit that issued, therefore, which bore a similar "grandfathering" statement,[64] was not directed to the development at issue before this court.[65]

During 1981 and 1982, Leon County engaged in negotiations to purchase the property which is the subject of this suit.[66] Chairman of the Leon County Commission at that time, Jim Crews, states that he had several meetings with Plaintiffs or their agents on behalf of the Board.[67] Crews states in his affidavit: [68]

> Specifically, the affiant, acting as Chairman of the Board of County Commissioners of Leon County, Florida, promised Pelham and Stocks that in return for Pelham and Stocks not immediately applying for building permits, the Leon County Commission would not attempt to pass any new land use regulations to control development around Leon County lakes unless the regulations contained "grandfathering" provisions that would permit development of the Lake Jackson property in a manner consistent with their development plans.

Crews further avers that Plaintiffs could have applied for building permits but refrained from doing so in reliance upon his promise.[69] He states that he made promises to Pelham and Stocks "specifically to induce them to not go forward with the development of the property at that time," knowing they were entitled to apply for building permits for multi-family construction at that time.[70]

Crews also states that on several occasions in 1981 and 1982, he told Pelham or Stocks that "Leon County would take no action to downzone or restrict the use of their Lake Jackson property and that the right to develop that property was vested." [71] Crews states: [72]

> That during 1981 and 1982, affiant and the other members of the Leon County Commission, were all aware that Pelham and/or Stocks had expended considerable sums of money to develop the Lake Jackson property in a manner that would permit multifamily housing.

Crews states that he "repeatedly told Pelham that his right to develop the Lake Jackson property was vested and that Leon County would take no action to hinder or delay the project." [73]

Another County Commissioner at that time, Lee Vause, states in his affidavit that in 1981 and 1982 "the County" requested that the developers remove the property from the market to give the County a chance to acquire it, and "publicly committed that if the effort was unsuccessful in securing public ownership, the Affiant would not attempt to restrict the then existing multi-family development rights on the subject property of Mr. Pelham." [74] Vause further states that "[i]t is my recollection that the Commission as a body publicly shared my view." [75]

Pelham states in his second affidavit that Commissioner Nelson was also authorized to speak for the County Commission, and that both Crews and Nelson had authority from Leon County to request that the landowner

---

**62.** Doc. 313, Speidel dep., pp. 36–37 and ex. 10.

**63.** *Id.* and p. 73.

**64.** *Id.*, ex. 11.

**65.** Plaintiffs do not contend otherwise since this evidence was not mentioned in their memorandum.

**66.** Doc. 331, First Pelham aff., para. 31.

**67.** Doc. 331, Crews aff., ex. 4.

**68.** *Id.*, para. 5.

**69.** *Id.*, para. 4.

**70.** *Id.*, para. 9.

**71.** *Id.*, para. 6.

**72.** *Id.*, para. 7.

**73.** *Id.*, para. 8.

**74.** Doc. 331, ex. 5, para. 4.

**75.** *Id.*

not proceed with development of the property until the negotiations for purchase of the land were completed.[76] Pelham avers that Commissioner Nelson made the same promise as stated by Vause, and that his right to develop the land was vested.[77] He states that Nelson told his agent that if the property were "taken off the market for approximately one year, the Leon County Commission would take no action to endanger development rights on the subject property."[78] Pelham states that in reliance upon these promises, he took the property "off the market" for more than a year and did not "proceed with development at that time."[79]

The minutes from the meetings of the Board of County Commissioners which have been filed in this record indicate that on January 6, 1981, the Board considered a letter from John Stocks suggesting an exchange of government owned land for "his" Lake Jackson property. Stocks offered to hold all construction activities for multi-family dwellings in abeyance for 90 days for "tangible evidence of an exchange taking place."[80] The Assistant County Manager advised the Board that there was no County land available for a land swap, and the Board directed the County Administrator to obtain information from state officials as to whether the state might be interested in a land swap through various environmental land acquisition programs. The Board did not vote to determine that anyone had a "vested" right to develop the property with multi-family dwellings, and it did not vote to extend a promise to the owners of the land that if they ceased to develop it or to seek a buyer that they would be exempted from future regulations designed to protect Lake Jackson.[81]

Finally, the Board did not mention Pelham's promise that no development would be undertaken below the 105 foot contour, and consequently no vote was taken by the Board to relieve Pelham of that promise.[82]

The issue of a land swap was discussed at meetings of the Board of County Commissioners on February 10, 1981,[83] December 8, 1981,[84] December 15, 1981,[85] September 14, 1982,[86] November 16, 1982,[87] and December 7, 1982.[88] But as with the first minutes discussed above, the Board did not vote to determine that anyone had a "vested" right to develop the property with multi-family dwellings, it did not vote to extend a promise to the owners of the land that if they ceased to develop it or to seek a buyer that they would be exempted from future regulations designed to protect Lake Jackson, and it did not mention Pelham's promise that no development would be undertaken below the 105 foot contour line.[89] Consequently, there is no evidence in this record that the Board voted to authorize any county commissioner to extend those promises to the owners of the property, or to relieve Pelham of the promise not to build below the 105 foot contour line.

On December 7, 1982, the minutes reflect that the "Cabinet" (the Florida Governor and Cabinet) had approved the exchange, but that Stocks had set a deadline of December 31, 1982, for the exchange, and Commissioner Nelson did not think there was sufficient time to finalize the exchange.[90] Stocks had written to a state official on October 18, 1982, advising that he wished to "terminate this proposed exchange with the state." Copies

76. Doc. 331, second Pelham aff., para. 38 and 39.

77. Id., para. 40 and 42, 43.

78. Id., para. 47.

79. Id., first Pelham aff., para. 33; second aff., para. 50.

80. BCC Book 50, p. 575.

81. Id.

82. Id.

83. BCC Book 51, p. 41.

84. BCC Book 52, p. 776.

85. BCC Book 52, p. 805.

86. BCC Book 54, p. 189.

87. BCC Book 54, p. 439.

88. BCC Book 54, p. 522.

89. Id.

90. BCC Book 54, p. 522.

were sent to County officials and the letter appears as a record the next day in BCC Book 54, p. 351. The last entry in the Commission minute book is on January 18, 1983, noting that "there was a notice of sales of some property at Lake Jackson owned by Mr. John Stocks in the Tallahassee Democrat. No action was taken." [91]

In October 1987, the County directed its staff to contact and coordinate research and actions between various agencies to prepare a plan for protection of Lake Jackson. The group which was formed to conduct this study and plan was called the Lake Jackson Technical Advisory Committee.[92] In a workshop held on January 19, 1988, the Committee produced a report entitled "Lake Jackson Conservation Plan." [93] The report found that Lake Jackson is within an enclosed basin, sits upon a clay layer, and is largely dependent upon surface water runoff and rainfall to maintain water quantity and quality. It found that the lake "continues to present symptoms of declining water quality, the result of surface water runoff from a growing urban area along its southern shore." It was the consensus of the task force that "immediate and decisive actions are imperative in order to reverse the current trends of decline of this precious and irreplaceable natural resource." [94] A number of recommendations for action were made, including adoption of a zoning district for low density residential use, down-zoning all unimproved property within the 96.5 foot contour line, and down-zoning all property between 96.5 and the 100 foot line to R–1. All residential uses were recommended to be allowed in the area from the 100 foot line to 120 feet.[95] This report was submitted to the Leon County Commission.[96]

Also on January 19, 1988, the Leon County Commission was advised that Villas of Lake Jackson, Ltd., had sued the County seeking damages and a court order to compel the Board to take action as to its development plans.[97] The Board considered the recommendations from the workshop conducted earlier that day.[98] The recommendations were not specific to the development proposed by Plaintiffs, but considered many aspects of drainage and development around all portions of the lake. Among the recommendations considered was to adopt a "new zoning district for low density residential use and evaluate downzoning for all unimproved property within environmentally sensitive areas, including areas below the 96.5 contour of the lake or within other areas appropriate for low density residential land use." [99]

The County adopted Ordinance No. 88–6 on January 19, 1988. The Ordinance recited that the County had "caused a study to be made by various state and local regulatory and management agencies concerning the status of Lake Jackson and the impact of development within the watershed of the lake...." [100] It found that Lake Jackson had been designated an "Outstanding Florida Water" and an "aquatic preserve," and "is threatened by the degradation that can be expected to follow from continued development within the watershed basin of said lake, influenced mainly by the results of surface water runoff in the lake from the growing urban area which partly surrounds the lake." [101] The Ordinance found that "reduction of the density to which land is permitted to be developed has been shown to reduce the adverse impacts of further development upon the quality of water within water bodies." [102] It found that "an emergency exists with respect to the density to which land may be developed within the Lake Jackson basin,"

**91.** BCC Book 54, p. 896.

**92.** Swanson aff., para. 6.

**93.** *Id.* Ex. B to the Swanson affidavit is the plan.

**94.** Swanson aff., ex. B.

**95.** *Id.*

**96.** Swanson aff., para. 6.

**97.** O'Neal aff. (5–12–94), ex. II, BCC Book 69, p. 798.

**98.** *Id.*

**99.** *Id.*, p. 803, para. 11.

**100.** *Id.*, p. 808.

**101.** *Id.*, pp. 808–809.

**102.** *Id.*, p. 809.

and that "there should be a reduction in the rate and extent of development permitted within this lake basin until better means are devised for protecting the water quality entering said lake from runoff."[103] As a consequence of these findings, the Ordinance imposed a moratorium upon development orders for any structure except single family dwellings located below the 120 foot contour line.[104] The Ordinance was limited to 21 days, expiring on February 9, 1988.[105]

The Commission met again on February 9, 1988.[106] The Commission extended the moratorium upon development below the 120 foot contour line to August 9, 1988, to provide time to draft and adopt a comprehensive Ordinance governing development in the watershed.[107] Ordinance No. 88–10, which was then adopted, making the same findings as Ordinance No. 88–6.[108]

On February 23, 1988, the Board considered an application by Talquin Electric Cooperative, Inc., to expand sewer service to an area which included the land at issue in this case, the adjacent development called "Villas on the Lake," and another area to the northwest.[109] Plaintiff Pelham attended the meeting and urged that the application be adopted.[110] George E. Lewis, a citizen, voiced opposition, argued that no development should be permitted below the 99 foot contour, and submitted to the Commission copies of the letters discussed above exchanged between the Leon County Health Department director and Pelham in 1972.[111] It was noted that the master drainage plan

for this expansion had already been approved, and the Commission approved the application.[112] One of the dissenters, Commissioner Henderson, moved that the County sponsor an application for rezoning the remaining undeveloped portion of Villas on the Lake to R–1.[113] Two of the Commissioners, Nelson and Vause, who voted to approve the application stated that they had previously made the commitment that there were "vested rights on this parcel" and said they would "not participate in downzoning the property."[114]

The temporary moratorium ended on August 30, 1988, with adoption of Ordinance No. 88–53.[115] Ordinance No. 88–53 found that Lake Jackson, as well as other of Leon County's water drainage basins, is a closed system with maximum dependency upon surface water runoff and rainfall for water quality and quantity. It found that these drainage basins continue to evidence symptoms of declining water quality resulting from runoff from growing urban areas. The decline was evidenced by increasing aquatic weeds, algae, cultural eutrophication, turbidity, inorganic solids, and altered fish and wildlife populations. It found that immediate action was needed to reverse current trends of such decline. The Ordinance recited that a broad based, interagency management capability was needed.[116]

The Ordinance established a "special development zone" adjacent to Lake Jackson. Zone A was the wetland and the transitional area to upland hardwood (the "ecotone")

103. *Id.*, p. 809.

104. *Id.*, p. 810.

105. *Id.*, p. 811.

106. BCC Book 70, p. 61. The date on this Minute Book entry is 1987, but the attached materials are dated 1988. The entry clearly references the matters considered by the Commission in February 1988.

107. *Id.*, p. 75. An exception was permitted for any use which could be shown affirmatively to have no adverse impact on the water quality of Lake Jackson. *Id.*, pp. 76, 80.

108. *Id.*, pp. 77–81.

109. BCC Book 70, pp. 171–173.

110. *Id.*, p. 174.

111. *Id.*

112. *Id.*, pp. 174–175.

113. *Id.*, p. 175.

114. *Id.* This is the first mention in the minutes of the Board of County Commissioners of "vested rights." It does not constitute the official position of the Board since it was the opinion of only two Commissioners.

115. BCC Book 70, p. 645.

116. *Id.*, pp. 646–648.

around all of Lake Jackson, defined as the land between contours 88 and 100 feet. In that zone, 95% of the land was to be left undisturbed, and no structures were to be allowed below 96.5 feet unless approved by the Commission.[117] Since this Ordinance was enacted, Leon County has adopted similar regulations for the ecotones of Lake Iamonia, the Bradford Brook Chain of Lakes, and Fred George Sink. Regulatory zones are proposed and under consideration for Lakes Munson and Lafayette.[118]

On October 3, 1988, Pelham wrote to Helge Swanson, Director of Environmental Permitting for Leon County. Pelham noted that he had on file applications for permits for Phases II and III of the Villas, that the permits had been denied for not complying with the new Receiving Waters Bodies Act and due to the moratorium (Ordinance 88–53). He said that he was submitting a "new Phase II application which clearly meets all criteria under the new Ordinance." Pelham further said that this new application was not a waiver of any rights under previous applications, which he considered to be "still pending." Pelham further said that while he submitted funds to pay for a stormwater management permit and a landscape permit, "[o]bviously, it is still our position that *NO* stormwater permits are required because we are grandfathered in our vested rights."[119] Plaintiff's application was not approved for a number of reasons set forth in two letters,

with the last disapproval by letter dated February 24, 1989.[120]

Meanwhile, Ordinance 88–53 was replaced by Ordinance No. 88–62 on October 11, 1988.[121] The restrictions as to development in the zone from 88 to 100 feet were unchanged.[122]

On June 20, 1989, Commissioner Henderson moved that the property at issue in this case be rezoned from RM–3 to R–1.[123] Commissioner Yordon moved, with a second from Henderson, that the rezoning change be to A–1 [Agricultural 1] Limited Use.[124] The agenda request prepared by staff for this meeting noted that while the request would have characteristics of a spot zone, since it would not abut other A–1 properties, "the request would also be consistent with the zoning and land use patterns in the area."[125] The staff agenda also said that "[a] large portion of the Bent Tree Estates subdivision was developed under the development standards of the A–2 district...."[126]

At the June 20th meeting, George E. Lewis, who had appeared at the February 23, 1988, meeting, and who then had brought to the attention of the Commission Plaintiff Pelham's September 18, 1972, letter, again presented to the Commission the letters of Dr. Bennison and Pelham's letter of September 18, 1972. Lewis supported the rezoning proposal, noting that most of the site was below the 100 foot contour line.[127] A copy of Pelham's 1972 letter is filed in the Minute Book at BCC Book 75, pages 92–95.[128]

117. *Id.*, p. 653.

118. Swanson aff., para. 7.

119. Swanson aff., para. 9 and ex. D, emphasis in the original.

120. *Id.*, para. 10 and 11 and exs. E and F; Swanson dep., 8–29–90, p. 58.

121. BCC Book 72, pp. 343–360.

122. *Id.*, p. 352.

123. BCC Book 75, p. 91.

124. *Id.* Defendant represents that this motion was adopted unanimously, citing page 107 of Minute Book 75, but neither that page nor page 91, where the motion was made, reflect such a vote. Nonetheless, it is evident that the rezoning process began by at least a majority vote because

page 107 carries the comment by Chairman Nelson that staff do certain things when it analyzed the Agricultural Zoning. It is also noted that attached to these materials is a notice from the Tallahassee–Leon County Planning Department which advised affected property owners on July 17, 1989, that a petition was under consideration to rezone this property to Agricultural 1 Limited Use. Further, as will be noted ahead, the Planning Commission had a public hearing on this rezoning request on August 22, 1989. *Id.*, ex. D.

125. Alam aff., para. 2(c) and attachment C, p. 3.

126. *Id.*

127. BCC Book 75, p. 91.

128. The Health Department letters are pp. 96–98.

On July 27, 1989, Plaintiffs filed a modified application for Villas of Lake Jackson Phase II. The modification attempted to comply with Ordinance No. 88–62.[129]

On August 22, 1989, the County Commission considered the rezoning of the property to Agricultural 1 Limited Use.[130] The Planning Commission had approved the request.[131] Plaintiffs sought a 120 day extension so that they could present a new plan for stormwater treatment.[132] Assistant County Attorney LaCroix expressed concerns about rezoning for a limited use, suggesting that if the Board wished to rezone to A–1 or Estate Zone without limitation, the agenda would have to be readvertised.[133] The Board continued the issue to October 24, 1989, for consideration of rezoning both to A–1 and to Estate Zone, with directions to initiate the latter rezoning action.[134]

On October 3, 1989, environmental permits for stormwater and landscape were issued for that project as modified for multi-family development.[135] The permits are attached as exhibit A to the affidavit of Helge Swanson. The permits were conditional, noting that there was an exhibit 3 as to "pending rezoning notice." Exhibit 3 to the permits cautioned:

> Applicant is advised that, since there is pending a possible rezoning which, if approved, would prohibit the use of the property in the manner for which this permit, # 89–0354, was approved, any development activity under this site plan is at the applicant's risk.

In the fall of 1989, Pelham and his companies began construction of Villas Phase II, completing a storm water filter, fence, and hay bales for conveying storm water.[136] On October 24, 1989, over Pelham's objections, the County Commission down-zoned the property to Estate Zone by adoption of Ordinances Nos. 89–37 and 89–38.[137] The conditional 1989 environmental permits and associated building permits were formally revoked by the County Commission on October 31, 1989.[138]

Pelham states that at the time his property was rezoned to Estate Zone, there was no real property within one-half mile with that zoning, and that 5,000 acres adjacent to the lake were zoned Agricultural.[139]

Pelham states in his affidavit that in the period from 1975 through 1989, Leon County generally issued building permits for at least 14 development phases with knowledge that these improvements were part of a general plan to construct multi-family dwellings on the two parcels purchased from Mr. and Mrs. Faulk.[140] He further states that Leon County approved utility extension permits, sewer line extensions, septic tanks, water lines, and underground electric lines for each phase with knowledge that the general plan included construction of multi-family housing on the two parcels.[141] Plaintiff Pelham does not set forth specific facts as to which County officials had such knowledge, and does not aver that any County official was aware of, and acted to relieve Plaintiffs of the promise not to develop below the 105 foot contour line.

129. Swanson dep., 8–29–90, p. 66.

130. BCC Book 75, pp. 512–514.

131. Alam aff., ex. D.

132. *Id.*, p. 515.

133. *Id.*, p. 516.

134. *Id.*, pp. 516–517.

135. *Id.*, p. 67.

136. Doc. 331, second Pelham aff., para. 64.

137. BCC Book 76, pp. 255–262; doc. 331, second Pelham aff., para. 71.

138. BCC Book 76, p. 313.

139. Doc. 331, second Pelham aff., para. 75–76.

140. Second Pelham aff., para. 13–17. Parcel A is the 125 acre parcel bought by Bent Tree, Ltd. *Id.*, para. 1. Parcel B is the 40 acre parcel bought by Pelham and Pennington is referred to by Pelham in his second affidavit as parcel B; Villas Phase I was built on this 40 acre parcel. *Id.*, para. 2–4.

141. *Id.*, para. 18–20. The affidavit refers to the two parcels by designation "A" or "B" or the "subject property," but makes no further distinctions as to specific portions of either parcel.

Pelham further avers that in 1988, the Leon County Commission approved sewer facilities for Phase I and for subsequent phases, and the sewer system that was installed to service all other phases as well as Phase I.[142] He states that in 1989 Leon County approved a franchise agreement between Equity Resources, Inc., and Talquin Electric Co. to provide utility service to the "property" and specifically approved the agreement to included not only development of Phase I, but Phases II–IV as well.[143] Pelham states that Leon County approved the construction and dedication of streets on the property during the period 1975 through 1989 with knowledge that these streets would service Villas Phases I–IV, and that this overall plan of development included multi-family dwellings on the two parcels.[144] Again, Plaintiff does not specify which official for the County had such knowledge or the basis for his conclusion that such knowledge existed, does not aver that any County official was aware that Plaintiff planned to develop below the 105 foot contour line, and does not aver that any County official purported to relieve Plaintiff of his 1972 promise not to develop below that line.

Pelham states that he constructed Phase I of the multi-family development in 1988 and 1989, but that if he had known that the County was to down-zone the remaining property, he would not have expended the money to extend the utilities to Phase I.[145] He states that in excess of $300,000 was expended "that can be directly attributed to development of Phases II, III, and IV." [146] He asserts that his total loss of profit is approximately $5 or $6 million, the net addition of value to the overall project had these three phases been built.[147] He asserts that development restricted to Estate Zone (for the approximately 12 acres in dispute) will result in a net loss of $50,000, and that marketing single family homes on land situated between commercial and multi-family development would be difficult.[148]

## B. Legal analysis of the claim of a property right created by equitable estoppel under Florida law

Generally speaking, a property owner in Florida acquires no vested right to the continuation of existing zoning. *City of Lauderdale Lakes v. Corn, supra,* 427 So.2d at 243. The mere purchase of land does not create a right to rely on existing zoning. *Pasco County v. Tampa Development Corp.,* 364 So.2d 850, 853 (Fla. 2d DCA 1978), citing *City of Miami Beach v. 8701 Collins Ave.,* 77 So.2d 428, 430 (Fla.1954). *Pasco County v. Tampa Development Corp.* held:

> Indeed, the Florida Supreme Court stated in *City of Miami Beach v. 8701 Collins Ave.,* supra, at 430: *"This Court has never gone so far as to hold that a City will be estopped to enforce an amendment to a zoning Ordinance merely because a party detrimentally alters his position upon the chance and in the faith that no change in the zoning regulations will occur. It is our view that such a doctrine would be an unwise restraint upon the police power of the government. All that one who plans to use his property in accordance with existing zoning regulations is entitled to assume is that such regulations will not be altered to his detriment, unless the change bears a substantial relation to the health, morals, welfare or safety of the public."*

364 So.2d at 853 (emphasis added). It further held:

> We consider it rudimentary law that an omission means a negligent or culpable omission where the party failing to act was under a duty to do so. Otherwise, silence or inaction will not operate to work an estoppel. In our view, the appellant county was under no lawful duty to act by way of zoning.

*Id.* The court found that the fact that the county had no zoning Ordinance was not an

142. *Id.,* first Pelham aff., para. 38.

143. *Id.,* first Pelham aff., para. 39.

144. *Id.,* second Pelham aff., para. 32–35.

145. Doc. 331, third Pelham aff., para. 4.

146. *Id.,* para. 5.

147. *Id.,* para. 8.

148. *Id.,* para. 9 and 11.

omission to act which justified reliance by the land owner. *Id.*

■ As previously discussed, however, Florida law also recognizes that a local government may be equitably estopped to refuse to issue building permits for a development based upon:

(1) a property owner's good faith reliance

(2) on some act or omission of the government and

(3) a substantial change in position or the incurring of excessive obligations and expenses so that it would be highly inequitable and unjust to destroy the right he acquired.

*Hollywood Beach Hotel Co. v. City of Hollywood*, 329 So.2d at 15–16, citing *Sakolsky v. City of Coral Gables*, 151 So.2d 433 (1963).

■ Equitable estoppel is said to apply against a governmental entity "only in rare instances and under exceptional circumstances." *Council Bros., Inc. v. City of Tallahassee*, 634 So.2d 264, 266 (Fla. 1st DCA 1994). The Government's act must go "beyond mere negligence," and must be one that "will cause serious injustice." *Alachua County v. Cheshire*, 603 So.2d 1334, 1337 (Fla. 1st DCA 1992).[149] Nonetheless, there are many cases in Florida where those "exceptional circumstances" have been found.

The *City of Hollywood* case, *supra*, found that "plaintiffs had spent almost two hundred thousand dollars on a site plan, models of the community, architect's plans and specifications and building permits" *"[w]ithout actual or constructive knowledge of any impending zoning change."* 329 So.2d at 16 (emphasis added). This, said the court, was a basis for equitable estoppel.

*Town of Largo v. Imperial Homes Corp.*, *supra*, found equitable estoppel where the Town knew that the property owner purchased the property contingent upon obtaining rezoning to multi-family, and approved

that rezoning request knowing that the property owner would rely thereon.[150] The owner then expended some $379,000 without knowledge that the Town contemplated a zoning change to single family. 309 So.2d at 573. The court held that the developer relied in good faith upon the unchanged position of the Town despite the fact that a number of persons protested the development at several Town commission meetings. *Id.* at 574.

In *City of Lauderdale Lakes v. Corn*, a developer bought 261 acres of land, presented the City with a development plan, and the City annexed the parcel and adopted zoning for it permitting the proposed development. The developer then expended substantial sums of money clearing the land, demucking it, filling and grading it, and installing a system of canals. One canal was designed to separate proposed residential development from commercial development. The developer then sought to build a shopping center and a mini-warehouse complex on the commercially zoned portion. Some ten years after the initial zoning had been approved, the City rezoned the parcel to a zoning precluding such development. The court found the City to have been equitably estopped to enforce this Ordinance against the developer.

In *Franklin County v. Leisure Properties, Ltd.*, *supra*, the court found equitable estoppel to exist where the land owner sought and obtained from the county a change of zoning to multi-family and, in reliance, built a water system large enough to serve multi-family development. 430 So.2d at 479. There was no evidence that the expenditures were not allocable to the multi-family portion of the proposed development, and the court indicated that the burden of showing this was on the county.[151] *Id.*

■ But it is also the law in Florida that the "documentation of vested rights or gov-

---

149. These statements of law seem to repeat the basic equitable standard that failure to estop the government would be *"highly* inequitable and unjust"* to the private citizen.

150. The property had been unzoned, but the developer wanted zoning which expressly permitted multi-family development. 309 So.2d at 572.

151. The burden of coming forward with evidence on a motion for summary judgment in this court is governed by federal law.

ernmental authorization must be clear, complete and specific. . . ." *Harbor Course Club, Inc. v. Department of Community Affairs*, 510 So.2d 915, 918 (Fla. 3d DCA 1987). *Harbor Course Club* found that since the developer's master plan had not specified an intent to build a golf driving range, the developer "could not, and did not, establish that they in any way relied on the filing of this Master Development Plan Map in 1977 to establish their vested right to develop the driving range on this subject property." *Id.* at 919.

To like effect is *City of Miami Beach v. 8701 Collins Ave.*, 77 So.2d 428 (Fla.1954). In that case, the court noted that plans for intended commercial uses of the basement area of the building to be developed were not shown to the City when the foundation permit had been issued. The court held, that "[t]he City, therefore, cannot be deemed to have sanctioned appellee's plans for the basement area by the mere issuance of the foundation permit for the hotel." 77 So.2d at 429.

■ The latter two cases reflect the equitable nature of the doctrine. "The theory of estoppel is an application of the rules of fair play." *Branca v. City of Miramar*, 634 So.2d 604, 606 (Fla.1994), citing *Town of Largo v. Imperial Homes Corp.*, 309 So.2d 571 (Fla. 2d DCA 1975). A fundamental equitable principle is that the party seeking equitable relief have the equities in his or her favor, or what is referred to as "clean hands." *Ocean View Towers, Inc. v. First Fidelity Sav. and Loan Ass'n*, 521 So.2d 325, 326 (Fla. 4th DCA 1988).[152]

The "clean hands" maxim and the equitable principle for which it stands signify that a litigant may be denied affirmative equitable relief by a court of equity on the ground that his conduct has been inequitable, unfair, dishonest, fraudulent or deceitful as to the controversy in issue. This maxim refers to the acceptability, cleanliness and decency of the claim put forth and describes equity's practice of refusing an equitable remedy to enforce a claim

that is itself inequitable, unconscionable or tainted by fraud or misrepresentation. Disputes between parties at real estate closings such as in this case do not constitute the kinds of acts or conduct within the basic rationale and purpose of this equitable maxim and the maxim should not be invoked to deny an equitable remedy to one who seeks the enforcement of the legal right to compel a party to a contract to do *that which was in the contemplation of the parties as expressed in their contract. Equity ought to require doing that which should have been done.*

*Henry v. Ecker*, 415 So.2d 137, 140 (Fla. 5th DCA 1982), *review denied*, 429 So.2d 5 (Fla. 1983) (emphasis added).

■ The case at bar is more like *Harbor Course Club* and *City of Miami Beach v. 8701 Collins Ave.* than the other cases discussed above. This case, however, unlike those cases, did not involve a mere omission of a significant detail of the proposed development. Here, the significant detail was expressly promised. Plaintiff Pelham told the county in 1972 that "we obviously do not intend to construct any improvements in any areas that might reasonably be expected to be subjected to flooding." He also said that "[a]ll permanent improvements would be located *substantially above* the proposed hereinafter described holding ponds." (Emphasis added.) As discussed above, the development now proposed for the 12.96 acres would start at the holding pond dike, not "substantially above" that line.

Finally, Plaintiff Pelham promised:

Of obvious major concern to the public, as well as of great concern to your office and our company, is the runoff into Lake Jackson and the possible deterioration of water quality in the Lake. . . . We would not anticipate construction of any buildings at an elevation of less than 105 feet. We are asking for rezoning to a RM–3 zoning classification.

---

152. "It is certainly beyond question that 'one who comes into equity must come with clean hands else all relief will be denied him regardless of the merits of his claim. It is not essential that the act be a crime; it is enough that it be condemned by honest and reasonable men.' *Roberts v. Roberts*, 84 So.2d 717, 720 (Fla. 1956)." *Id.*, 521 So.2d at 326.

Thus, the request for RM–3 zoning was tied to a promise not to build below the 105 foot elevation.

Plaintiffs cannot now demand entitlement to the benefits of multi-family zoning without honoring their promises not to build below the 105 foot contour line and to build "substantially above" the holding ponds. Those promises were unequivocal. The 105 foot contour line promise in particular was simple, easily understood, and provided a readily ascertainable standard for the proximity of the development to the surface of the waters of Lake Jackson. The promise to build "substantially above" the holding ponds was less precise, but at least with respect to the development now proposed, can clearly be understood to be in direct conflict with a proposal to build all the way to the edge of the pond dikes.

The promises were given by Plaintiff to allay the concern of Dr. Bennison's office, as well as the public, concerning "runoff" and "the possible deterioration of water quality of the Lake," and as a means to obtain the desired rezoning. The proximity of the development to the high waters of Lake Jackson, both in vertical feet and laterally from the water's edge, was the most significant factor with respect to preserving the quality of the water of the Lake. These promises prompted Dr. Bennison to withdraw his objections to the rezoning.

Plaintiffs had no duty to speak as to this matter, but having spoken, should be held to their word.[153] Plaintiffs cannot invoke equitable estoppel as to their reliance upon the rezoning to multi-family use and, at the same time, withdraw these essential elements of their 1972 bargain.[154]

The matter is not one of contract, but of equity. Essential to the state law claim of equitable estoppel is that a refusal to permit the development now proposed would be "highly inequitable and unjust." Plaintiffs have no ability to show that denial of a permit to develop below the 105 foot contour line was "highly inequitable and unjust" since it was their promise to build only above that line that was given to obtain the rezoning to RM–3.

While the evidence concerning the development of other parcels of land (the fourteen phases, extension of water, sewer, and roads) would ordinarily be persuasive as to the question of equitable estoppel, in this case such evidence is not. While such activities generally placed the County on notice that Plaintiffs were developing other portions of the property, it did not give warning that Plaintiffs intended to retract the 1972 promise and place multi-family dwellings on these parcels below the 105 foot contour line, or up to the edge of the holding ponds.

The 1981 or 1982 representations and promises to Plaintiffs made by Commissioners Crews, Vause, and Nelson, stand as undisputed fact on this record, but consideration of these do not change the balance of equities as a matter of law. It is recognized that Chairman of the County Commission Crews told that Plaintiffs' "right to develop the Lake Jackson property was vested" and did so in the context of his efforts to delay sale or development of the property in anticipation of state purchase of it, or a swap for other state land. It is also recognized that Commissioners Crews, Vause, and Nelson, all promised Plaintiffs that in exchange for taking the property off the market for a period of time and not developing it, Plaintiffs' rights to develop the property would be "grandfathered" against any new regulations controlling development there.

Defendant contends that the "vested rights" statement of County Commissioner Crews cannot work equitable estoppel because it is a statement of law. "As a general

---

153. " 'If a man is silent when he ought to speak, equity will debar him from speaking when conscience requires him to keep silent.' He comes with unclean hands, and is entitled to no consideration at the hands of a court of equity." *Hennessy v. Hudson*, 100 Fla. 967, 969, 131 So. 315, 316 (1930). The converse is equally true. Having promised, the promise should be honored if equity is to be served.

154. Cf. *Fromberg, Fromberg & Roth Properties, Inc. v. Springtree I, Ltd.*, 408 So.2d 1070, 1071 n. 2 (Fla. 3d DCA) *review dismissed*, 419 So.2d 1197 (Fla.1982) ("Plaintiff did not have 'clean hands' having given a check as a deposit on the contract knowing that it had no funds in the bank to cover it.")

rule, estoppel will not apply to mistaken statements of the law, ... but may be applied to erroneous representations of fact." *Council Bros., Inc. v. City of Tallahassee, supra*, 634 So.2d at 266; *Branca v. City of Miramar*, 634 So.2d at 606.

The distinction between statements of law and fact for purposes of equitable estoppel is a not one readily identifiable by Florida precedent since the real issue remains one of equity. In the *Council Bros.* case, a city plumbing inspector had advised a prospective bidder that certain sewer systems charges would not apply to the construction project subject of the bid. It was admitted that the inspector had been given authority by the city to provide such information to prospective contractors. 634 So.2d at 265. After the bid had been accepted, the contractor learned that it had to pay $49,000 in sewer systems charges, contrary to the advice it had been given prior to bid. The court found the city equitably estopped to enforce the charges. In so doing, the court said that the decision was not predicated upon distinctions between legal and factual representations. 634 So.2d at 267. The court found an "exceptional circumstance" to exist due to the express authority of the plumbing inspection: "Since the City undertook to provide contractors with information as to tap fees and systems charges, it was obligated to insure that its agent furnished accurate information." *Id.*

In contrast to the *Council Bros.* case, in *Greenhut Constr. Co. v. Henry A. Knott, Inc.*, 247 So.2d 517 (Fla. 1st DCA 1971), prior to bid, a Florida Department of Transportation employee expressed an opinion that a particular contractor was qualified under a statute to submit a bid. The contractor was not so qualified. The court found a lack of equitable estoppel, reasoning:

> In the first place the question about which Knott's [the contractor's] representative made inquiry to the bureau chief of General Services did not involve a question of fact but, on the contrary, involved a pure question of law. Whether Knott was qualified under the statute to submit a bid for

the construction of the legislative buildings in this case involved a complex question of law. The difficulty of the question is evidenced by the difference of opinion existing between the able trial court and this court as to the proper construction to be given the statute here considered. Knott in effect sought an administrative declaratory judgment from a state functionary who, while eminently qualified in the fields of architecture and engineering, is not shown to possess any of the qualifications necessary to render an authoritative judgment on the legal question posed by Knott, and who certainly is not one on whose opinion Knott had any right to rely.

247 So.2d at 524. In part this finding was an application of the rule that "[u]nder no circumstances may the state be estopped by the unauthorized acts or representations of its officers." *Id.*[155] However, the court also held that "[t]here is no showing in the record that Knott changed its position as a result of the verbal assurances it received, nor that it could have done anything to have prevented its disqualification as a bidder between the date of that conversation and the date on which bidding was closed." *Id.* In short, the finding that the opinion concerned a matter of law was mixed with a finding that the agent had no authority to render the opinion and a lack of good faith reliance by the contractor, both equitable considerations.

Another case of application of the rule that "a governmental entity may not be estopped through mistaken statements of the law" is *Branca v. City of Miramar, supra*. In that case, the elected mayor of the City retired after the City enacted a retirement plan covering him and other high ranking officials. The city attorney told him that the plan was lawful, and in reliance he retired thereunder. The plan became controversial, and he ultimately was the only person to have retired under the plan. The plan was later held to have been illegal by a circuit court. After first noting the normal rule that "a governmental entity may not be estopped through mistaken statements of law," and that "the validity of Miramar's pension plan is a legal

---

**155.** That rule still is cited in Florida. *Macnamara v. Kissimmee River Valley Sportsmans'* *Ass'n*, 648 So.2d 155 (Fla. 2d DCA 1994).

question," the court held that: "Branca relied upon *the fact* that Ordinance 88–16 had been duly enacted by the city commission. He irrevocably changed his position in reliance upon the Ordinance when he retired." 634 So.2d at 606–607.

Another case illustrative of the manner in which Florida courts apply these principles is *Dolphin Outdoor Advertising v. Department of Transportation*, 582 So.2d 709 (Fla. 1st DCA 1991). Dolphin applied for a permit for a roadside sign, representing that it would be 1600 feet from the next sign. The DOT sign inspector erroneously thought the legal requirement was a spacing of 1000 feet between signs. The regulation required spacing of 1500 feet. The court concluded as a matter of fact that the inspector had advised Dolphin that the location was acceptable. The application was approved, and Dolphin thereafter expended a substantial amount of money for a building permit and a lease for the site where the sign was to be located.

*Dolphin* found that these facts gave rise to equitable estoppel based upon that fact that the misrepresentation had been made, even though based upon an erroneous view of the law. *Dolphin* relied upon *Kuge v. State, Department of Administration*, 449 So.2d 389 (Fla. 3d DCA 1984) for this conclusion. In *Kuge*, a state employee decided to retire after having been erroneously informed by the retirement agency that she had sufficient years of credit to vest a retirement. The court found these representations to be factual, even though based upon an underlying misunderstanding of the law.[156]

■ This court gleans from these cases that while Florida courts observe a distinction between opinions of fact and opinions of law when applying equitable estoppel against a governmental agency, the decisions actually turn upon conventional equitable considerations. More relevant to the inquiry is the complexity of the factual and legal opinion given, whether the governmental agent was routinely in the business of providing such advice to the public, whether the agent was expressly authorized to give such advice, and whether, considering all of the surrounding circumstances, the private citizen was otherwise justified in relying upon the advice given.

■ In the case at bar, the statements and assertions of Commissioners Crews, Vause, and Nelson do not give rise to equitable estoppel against Leon County. Unlike the plumbing inspector in the *Council Bros.* case, or the sign inspector in the *Dolphin* case, there is no evidence that Crews was authorized by the Board of County Commissioners to render an opinion upon the complex factual and legal question of "vested" rights, or that he regularly undertook to give such advice to developers. Nor is there any evidence that Commissioners Crews, Vause, or Nelson were authorized by the Board of County Commissioners to extend a promise to Plaintiffs binding upon that Board, as well as any subsequent Board, that Plaintiffs' "development" would be exempted from all future regulation. As to both of these questions, the minutes of the Commission meetings at that time only reflect that individual Commissioners had authority to explore the possibility of a land swap or purchase with Plaintiffs. There was never a vote authorizing these Commissioners to bind the County with respect to these two matters.

Further, and of greater importance, there is nothing in the affidavits of Pelham, Crews, Vause, Nelson, or the minutes of the Board of County Commissioners which addressed and altered Plaintiffs' promise not to build below the 105 foot contour line and to build substantially above the holding ponds. Plaintiffs carried those promises, made in 1972, with them into the 1981–82 negotiations. When Commissioner Crews informed them that he thought that they had "vested rights" to "develop" the property, and when all three Commissioners promised grandfathering for that "development," Plaintiffs surely remembered that the "development" they had promised the County in order to obtain the 1972 rezoning was to build only above the 105 foot contour line and substantially above the holding ponds. Plaintiffs were silent where they had a duty to speak. They cannot now call on this court to do

---

**156.** *Kuge* and *Branca*, thus, are similar.

equity.[157] Even if the assertions of Crews, Vause, and Nelson were a basis for equitable estoppel as to some multi-family development, the "development" vested and grandfathered would only be that above the 105 foot contour line, and not to the edge of the holding ponds.

On October 3, 1989, the County issued permits for a scaled-down development. The permits, however, were expressly conditioned upon the pending rezoning proposal. The permits advised that the permitted development would be prohibited if the rezoning took place, and warned that development activity was at the applicant's risk. Plaintiffs, therefore, had actual notice that formal rezoning procedures were in process, and had a clear warning of the consequences if rezoning occurred. Moreover, for months preceding the issuance of the permits, the County had been considering rezoning, and on August 22, 1989, had scheduled a vote for rezoning to Estate Zone for October 24, 1989.

*City of Hollywood v. Hollywood Beach Hotel Co.*, 283 So.2d 867 (Fla. 4th DCA 1973), *aff'd in pertinent part*, 329 So.2d 10 (Fla. 1976), held that "[t]here exists a separate line of cases which hold that if the landowner has actual or constructive knowledge of an impending zoning change when he obtains his building permit, he has no basis for a claim of equitable estoppel even if he has substantially changed his position or incurred extensive obligations." Cited for this rule are *Sharrow v. City of Dania*, 83 So.2d 274 (Fla.1955) and *City of Ft. Lauderdale v. Lauderdale Industrial Sites*, 97 So.2d 47 (Fla.1957). 283 So.2d at 870.[158] To like effect, *Smith v. City of Clearwater*, 383 So.2d 681, 688–689 (Fla. 2d DCA 1980), *review dismissed*, 403 So.2d 407 (Fla.1981) (emphasis added) held:

> After careful consideration, we believe that the better rule and one which is consistent with most if not all Florida decisions can

be stated as follows. Where a property owner meets the requirements specified in *Town of Largo v. Imperial Homes Corp.*, 309 So.2d 571 (Fla. 2d DCA 1975), the municipality will be estopped from denying him a building permit on the grounds that his project constitutes a non-conforming use. However, even if he has not made the substantial expenditures in reliance upon the city's position necessary to create an estoppel, he is still entitled to obtain a building permit which is within the provisions of existing zoning *so long as the rezoning ordinance which would preclude the intended use is not pending at the time when a proper application is made. For a zoning change to be pending within this rule, it does not have to be before the city council, provided the appropriate administrative department of the city is actively pursuing it. Of course, mere thoughts or comments by city employees concerning the desirability of a change are not enough. There must be active and documented efforts on the part of those authorized to do the work which, in the normal course of municipal action, culminate in the requisite zoning change.* The city council or the applicable city planning board must at least be aware that these efforts are going forward.

Thus, the 1989 permits add nothing in favor of Plaintiffs with respect to the equitable analysis above. The permits were conditional, formal rezoning was in process, and Plaintiffs were aware of these limitations. The 1989 permits do not give rise to a claim of equitable estoppel, either considered independently or in conjunction with all of the matters discussed above.

Almost all of the 12.96 acres which Plaintiffs seek to develop for multi-family housing is below the 105 foot elevation.[159] It would be theoretically possible for this court to adjudicate whether Plaintiffs may rely upon

---

157. See footnote 153, *supra*.

158. Similarly, *City of Boynton Beach v. Carroll*, 272 So.2d 171 (Fla. 4th DCA 1973), *cert. denied*, 279 So.2d 871 (Fla.1973), held that the zoning law in effect at the time of the final decision on the application for a permit governs, especially where the application was made after publication of the required notice prior to amendment of

the zoning law. 272 So.2d at 172. *See also Pompano Beach v. Yardarm Restaurant, Inc.*, 509 So.2d 1295, 1297 (Fla. 4th DCA 1987) (a municipality may properly delay issuance of a building permit when there is a change in zoning in progress which would affect the permit).

159. Page 30 and footnote 42, *supra*.

equitable estoppel to develop the very small portion (0.43 acres) above the 105 foot contour line with multi-family dwellings, but that is undoubtedly not feasible, and the court does not perceive that this is Plaintiffs' intent in this law suit. Accordingly, the court will not undertake that theoretical task.

In summary, at the heart of great complexity there is often a simple truth. The evidence is voluminous, but there is little genuine dispute as to material facts. The pivotal fact, Plaintiffs' dual promise not to build below the 105 foot contour line and to build substantially above the holding ponds, is not disputed at all. This dual promise is determinative of the equities between the parties. The County is not equitably estopped under Florida law to adopt new regulations and rezoning precluding multi-family dwellings below the 105 foot contour line or to the edge of the holding ponds.

Thus, Plaintiffs' Due Process claims, premised upon acts or omissions of the County from 1972 through 1989, fail for lack of a property interest created by state law. Defendant is entitled to summary judgment in its favor as to Counts II and III for this reason.

### III. Whether, after *McKinney v. Pate*, 20 F.3d 1550 (1994) (*en banc*), the substantive due process claims of Counts II and III survive

After the memoranda on the two motions for summary judgment were filed, the Eleventh Circuit decided *McKinney v. Pate*, 20 F.3d 1550 (1994). Defendant filed supplemental argument as to the applicability of

this decision to Counts II and III, but Plaintiffs have filed no response.

■ *McKinney* held that substantive due process applies only if the right encroached upon is fundamental, created by the Constitution, and not if the right is created only by state law. 20 F.3d at 1556. Since property rights only exist by state law for due process purposes,[160] it may be argued that *McKinney*, forecloses the substantive due process claims in this case.[161]

*McKinney*, however, said that its analysis of the difference between a substantive and a procedural due process claim is not appropriate for a legislative act, but applies only where rights are taken by action of the executive branch of a government. 20 F.3d at 1557 n. 9. Thus, substantive due process claims challenging legislative acts are not governed by the *McKinney* decision. *Parks v. City of Warner Robins, et al.*, 43 F.3d 609, 613 n. 2 (11th Cir.1995); *Holmes v. U.S.*, 868 F.Supp. 1348, 1354 n. 7 (M.D.Ala.1994).[162]

The parties have argued the legislative-executive distinction in this case, albeit for a different purpose since this was argued prior to *McKinney*. Defendant contends that the only relief that Plaintiffs may obtain for the substantive due process claim of Count II is injunctive, arguing that the claim can only be a facial challenge to Ordinances 88–53 and 88–62, because those Ordinances were generally applicable to all property in the Lake Jackson drainage basin.[163] Plaintiff contends that damages are available because "it was not the Ordinances that stopped the development of this property, it is the arbitrary and

160. "[T]he Constitution does not create property interests. Rather it extends various procedural safeguards to certain interests 'that stem from an independent source such as state law.'" *Leis v. Flynt*, 439 U.S. 438, 441, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1079), quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

161. The Supreme Court is reluctant to expand the list of fundamental rights recognized protected by substantive due process. *Bowers v. Hardwick*, 478 U.S. 186, 194, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986). It has never held that the question of what is "property" for Fourteenth Amendment Due Process purposes is defined in any way by the United States Constitution.

162. Preceding *McKinney* was the Eleventh Circuit's opinion in *The Reserve, Ltd. v. Town of Longboat Key*, 17 F.3d 1374 (1994). That case resolved issues discussed in the order on the motion to dismiss, finding that a substantive due process claim may be made where the property interest arises from Florida law principles of equitable estoppel. *The Reserve* did not explore the question of whether a substantive due process claim exists at all when the state law property interest is infringed by legislative action. But *The Reserve* is consistent with earlier precedent that such a claim exists, and *McKinney* did not decide the issue.

163. Doc. 311, pp. 19–20.

capricious manner in which the County applied the Ordinances while downzoning the property that has destroyed Plaintiffs property rights."[164] Thus, Plaintiff relies upon its challenge to the 1989 rezoning as a basis for seeking damages.

In Florida, "comprehensive rezonings affecting a large portion of the public are legislative in nature." *Board of County Commissioners of Brevard County v. Snyder*, 627 So.2d 469, 474 (Fla.1993). Ordinances 88–53 and 88–62 were legislative in nature, applying this test. The Ordinances applied generally to the entire Lake Jackson drainage basin.

The rezoning in 1989 of Plaintiff's property arguably was quasi-judicial, however.

"[R]ezoning actions which have an impact on a limited number of persons or property owners, on identifiable parties and interest, where the decision is contingent on a fact or facts arrived at from distinct alternatives presented at a hearing, and where the decision can be functionally viewed as policy application, rather than policy setting, are in the nature of ... quasi-judicial action...."

*Snyder*, 627 So.2d at 474, quoting the opinion below, *Snyder v. Board of County Commissioners of Brevard County*, 595 So.2d 65, 78 (5th DCA 1992).

Again, the contentions of the parties, while accurate, work unintended results.[165] If the 1989 rezoning were not a legislative act, *McKinney* would compel the conclusion that substantive due process would not be available since only a state law created property interest[166] was affected. Another argument is available to Plaintiffs, however. The 1989 rezoning was compelled by policy consider-

ations arising from the 1988 Ordinances, which set policy of general application for all land surrounding Lake Jackson. The 1989 rezoning was needed to conform to that Ordinances of more general application. Thus, it is arguable that the 1989 rezoning more resembles the denial of amendment to a comprehensive plan in *Section 28 Partnership, Ltd. v. Martin County*, 642 So.2d 609 (4th DCA 1994), which that court held to have been a legislative act. If this is so, Plaintiffs' substantive due process challenge to the 1989 down-zoning would still be viable after *McKinney*.

Since Plaintiffs have not shown any due process property right created by state law, however, this court need not determine the impact of *McKinney* on this case. This is the better course at this stage in this case, since the application of *McKinney* involves additional complex questions of state law, and further briefing by the parties would only delay the final disposition of this case.

## IV. Whether Defendant is entitled to judgment as a matter of law as to Count IV claiming denial of equal protection

### A. Undisputed facts

With regard to the claim of denial of equal protection of the law, Plaintiffs have identified several properties in the Lake Jackson drainage area which Plaintiffs contend were treated differently. The first is Lake View Acres. Leon County approved development of approximately 80 single family residences on 120 acres in Lake View Acres, and more than one-half of that development uses Plaintiffs' storm water treatment area.[167] More

---

**164.** Doc. 330, p. 18.

**165.** The reversal of positions on collateral estoppel is another.

**166.** This presumes the existence of such an interest, which does not exist in this case.

**167.** Doc. 331, second Pelham aff., para. 84 and 85. Pelham further states that "storm water runoff from Lake View Acres is similar to the amount of storm water runoff that would have been produced by development of Phase II, Phase III, and Phase IV of the subject property." *Id.*, para. 88. He also states that "contaminants

produced by Lake View Acres exceed the amount of contaminants that would have been produced by development" of Phases II–IV. *Id.*, para. 92. These assertions concern facts which cannot be readily ascertained simply by looking at the land. Affidavits in support of or opposition to the motion must be on personal knowledge and affirmatively show that the affiant is competent to testify to the matters asserted. Rule 56(e). Further, Pelham's expertise in these matters, and his personal measurement of the matters, has not been established. A basis for an opinion pursuant to Fed.R.Evid. 701 or 702 has not been shown. Accordingly, these statements will not be consid-

than one-half of the property, the portion below the 96.5 foot contour line, has been designated a permanent conservation easement as a forested buffer between the development and Lake Jackson.[168] The development also has multiple storm water collection systems, and ninety-five percent of the development is in land above the 100 foot contour line.[169] Since the development is single family, the impervious areas are less than the Lake Club Apartments to the west, which is a multi-family development.[170] The Lake View Acres project complies with all Leon County Ordinances, the comprehensive plan, and current environmental Ordinances.[171]

A second property identified is a multi-family development on Little Lake Jackson developed by Pennington and Wilson. Leon County permitted this development to install septic tanks and use fill dirt below the 100 foot contour, permitted a multi-family development on a lot of less than one acre, and permitted three septic tanks on less than one half acre lots, all in violation of the Environmental Matrix Ordinance.[172] Defendant refers to this property as the Sombra Del Lago townhouses.[173] Little Lake Jackson is adjacent to Lake Jackson, and is periodically connected to it.[174] This development has impervious areas broken up with green buffers, and as a townhouse development, will contain less directly connected impervious areas than Plaintiffs' proposed apartment development.[175]

A third property was a 158 unit development on Little Lake Jackson by Killearn Properties. Leon County permitted this development without requiring a storm water treatment facility.[176] Neither party identifies any other evidence in this record as to the nature of this development.

A fourth property identified is the Sugar Creek Plaza, or the Waccamaw Center. That development permitted commercial development below the 120 foot contour line as an exception to the Lake Jackson building moratorium.[177] This development is much farther away from Lake Jackson than Plaintiffs' property, between contour lines 110 and 140 at a much higher elevation.[178] The Waccamaw Center property drains into storm water treatment facility constructed by the Northwest Florida Water Management District which is considerably larger than the facility on Plaintiffs' property.[179]

A fifth property is the Eye Care Center. It was developed without a storm water treatment facility.[180] It is uncertain whether Leon County had anything to do with the permitting of that renovation of an existing building, which previously had been a restaurant, but like the Waccamaw Center, the building is a substantial distance from Lake Jackson, is at 150 feet elevation, and is considerably smaller in size than Plaintiffs' proposed development.[181]

A sixth property is the Hartsfield law firm. This building is adjacent to Lake Jackson and within the lake protection zone. It origi-

ered as adequate Rule 56 evidence on Defendant's motion for summary judgment.

168. Doc. 313, Swanson aff., para. 5 a.

169. *Id.*

170. *Id.* An estimate of the relative area of impervious areas compared to another development can be discerned simply by looking at the land, and requires no special expertise.

171. *Id.* Swanson also avers that only a small amount of storm water runs into Plaintiffs' treatment facility. There is a genuine dispute of fact as to the amount of such drainage.

172. Doc. 331, second Pelham aff., para. 94–97.

173. Doc. 313, Swanson aff., para. 5 c.

174. *Id.* Little Lake Jackson is perhaps 10 acres in area, and, is separated from Lake Jackson by U.S. Highway 27, which is a four lane divided highway. Doc. 313, Alam aff., attachment A, p. 3 is a map depicting Little Lake Jackson and the Sombra Del Lago development.

175. *Id.*

176. Doc. 331, second Pelham aff., para. 99.

177. *Id.*, para. 102 and 103.

178. Doc. 313, Swanson aff., para. 5 b.

179. *Id.*

180. *Id.*, para. 106.

181. Doc. 313, Swanson aff., para. 5 d.

nally had been a single family residence, is below the 100 foot contour line, has no sewer, and was permitted for a septic tank.[182] It has no storm water treatment facility.[183] The permit was for replacement of an existing septic tank.[184]

A seventh property is the Colson Building which is used for commercial publishing. The Colson Building is below the 100 foot contour line, has no sewer, was permitted for septic tanks, had no storm water facility, and produces ink and other by-products.[185] Like the Hartsfield building, the septic tank permit was to replace or relocate an existing septic tank.[186]

Finally, it is noted that Leon County constructed improvements to a boat ramp on Lake Jackson. A part of the lake bottom was excavated to make these improvements, and that work was done without any permit.[187]

## B. Legal analysis of Count IV, equal protection

### 1. The facial challenge to the Ordinances

 This case does not involve a suspect class or a fundamental right. Thus, the Equal Protection clause of the Fourteenth Amendment requires only that Ordinances 88–53 and 88–62, and the Estate Zoning Ordinance, be "rationally related to a legitimate state interest" to withstand a facial challenge. *Eide v. Sarasota County*, 908 F.2d 716, 722 (11th Cir.1990); *Panama City Medical Diagnostic Ltd. v. Williams*, 13 F.3d 1541, 1545 (11th Cir.1994), citing *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331–2332, 120 L.Ed.2d 1 (1992).

Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights *must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.*

*F.C.C. v. Beach Communications, Inc.,* — U.S. ——, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (emphasis added). "Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* Thus, "a state 'has no obligation to produce evidence to sustain the rationality of a statutory classification'" because "the burden is on the challenger to disprove every conceivable basis which might support the classification, 'whether or not the basis has a foundation in the record.'" *Panama City Medical Diagnostic Ltd.,* 13 F.3d at 1547, quoting *Heller v. Doe by Doe,* — U.S. ——, ——, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257 (1993).

 Unquestionably the Ordinances meet this lenient test. The County's interest in the protection of the water quality of Lake Jackson is not disputed in this record. In is also not disputed that this is a legitimate and important County interest.

The means chosen, delineating zones for regulating development according to location by elevation lines, and limiting the intensity of development in areas closer to the Lake, is conceivably[188] related in a rational way to that interest. It proceeds from the obvious

---

**182.** Doc. 331, second Pelham aff., para. 107–112. Plaintiffs do not fault this building for having been built originally, but only for having been permitted in recent years for a septic tank.

**183.** *Id.,* para. 113.

**184.** Doc. 313, Swanson aff., para. 5 e.

**185.** Doc. 331, second Pelham aff., para. 117–125. There is no competent evidence that the commercial enterprise at this location is discharging ink or other by products into Lake Jackson.

**186.** Doc. 313, Swanson aff., para. 5 f.

**187.** *Id.,* para. 127–130.

**188.** The analysis which follows is what is conceivable, and does not necessarily rely upon the factual record of this case. Since the legal purpose is different, it should proceed without consideration of the constraints governing Rule 56 evidence. *Compare* footnote 167.

fact that storm water runs down hill. The Lake is a closed basin. Storm water from higher elevations surrounding the Lake conceivably has the potential of flowing into the Lake, carrying with it solids and dissolved materials from the uplands. These solids and dissolved materials conceivably can deteriorate the quality of water in the Lake. However, the farther that water must flow during a rain storm, the greater likelihood that some of it, along with its burden of pollutants, will seep into the ground short of the Lake. Vegetation along the way, unimpaired by buildings or asphalt parking lots, enhances the possibility ·of such natural filtration. These general principles are both reasonably conceivable.

Therefore, these Ordinances, defining development zones based upon elevation and progressively limiting development as the development comes closer to the lower elevations, are rationally related to the County's legitimate interest of preserving the water quality of the Lake. A facial equal protection to Ordinances 88–53 and 88–62, or the Estate Zoning Ordinance enacted in 1989, is without merit on the undisputed evidence of record.

### 2. The "as applied" claim

·· The court understands that this is Plaintiffs' primary equal protection claim. Plaintiffs claim that others similarly situated have been granted exceptions to the Ordinances, and permitted to build, but that the County has intentionally singled out Plaintiffs to deny equal protection of the law by denying substantially similar exceptions to permit their proposed development.

As to this, "[a]n equal protection claim revolves around whether similarly situated persons are treated differently." *The Reserve, supra,* 17 F.3d at 1381.[189] "Different treatment of dissimilarly situated persons does not violate the equal protection clause." *E & T Realty v. Strickland,* 830 F.2d 1107, 1109 (11th Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988) "In order 'to prevail on a claim that defendant unequally applied a facially neutral statute, a plaintiff must show intentional discrimination.'" *The Reserve,* 17 F.3d at 1381, quoting *E & T Realty,* 830 F.2d at 1112. "Even arbitrary administration of the statute, without purposeful discrimination, does not violate the equal protection clause." *E & T Realty,* 830 F.2d at 1114. "The requirement of intentional discrimination prevents plaintiffs from bootstrapping all misapplications of state law into equal protection claims." *Id.*[190]

"Purposeful discrimination can be shown by circumstantial evidence." *E & T Realty,* 830 F.2d at 1114, n. 9. "For example, purposeful discrimination can be indirectly proven by a 'stark' pattern of adverse impact on a particular group." *Id.,* quoting *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).

While Plaintiffs' method of proof in this case is not to show a pattern of adverse impact upon itself, but a pattern of differing treatment of other properties, similarly situated, the necessity for proof of a "stark" disparity to prove intent to discriminate by means of circumstantial evidence should still pertain. Stated another way, the circumstantial evidence of differing treatment should reveal a pattern of irrationality.[191]

---

**189.** "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

**190.** "The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful dis-

crimination." *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944).

**191.** Judge Kravitch, dissenting in part in the *E & T Realty* case, felt that a claim (like the claim in the case at bar) did not allege group-based discrimination, and thus "intent to discriminate" was essentially irrelevant since the agency obviously intended to treat the several applicants differently. Judge Kravitch would instead analyze such claims entirely upon whether the government's differing decisions were rational. 830 F.2d at 1115. In any event, the irrationality of distinctions made is critical to whether Plaintiffs in this case have proved their case.

Where heightened scrutiny is not operative, an "as applied" equal protection claim will prevail if there is no rational basis for the differing treatment. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Landmark Land Co. of Oklahoma, Inc. v. Buchanan,* 874 F.2d 717, 722 and n. 3 (10th Cir.1989); *Cornerstone Bible Church v. City of Hastings,* 948 F.2d 464, 472 n. 13 (8th Cir.1991).

To the same effect is *Mackenzie v. City of Rockledge,* 920 F.2d 1554, 1559 (11th Cir. 1991) (footnote and citation omitted), which held that:

> Unequal application of a state law may violate the equal protection clause.... To overcome an equal protection challenge, distinctions between similarly situated persons must be reasonable, not arbitrary, and substantially related to the object of the legislation.

It has been recognized, therefore, that it may be very difficult to show unequal application of a zoning ordinance since each parcel can be unique. *Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1240 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994). Finally, summary judgment is appropriate with respect to an "as applied" denial of equal protection where the undisputed facts show that the other properties were not similarly situated. *Jackson Court Condominiums, Inc. v. City of New Orleans,* 874 F.2d 1070, 1079–1080 (5th Cir. 1989); *Spence v. Zimmerman,* 873 F.2d 256, 261–262 (11th Cir.1989).

■ Plaintiffs first argue that intent to discriminate can be shown by the fact that their property was rezoned to Estate while construction was underway. They argue that the property has commercial zoning on one side, and the RM–3 zoning (where Plaintiffs built the first phase of multi-family dwellings) on the other side, and contend that this is evidence of "spot" zoning, singling their property out to discriminate.

The history of the downzoning is that for years the County had been concerned about protecting the water quality of Lake Jackson. It eventually formed a joint study group, and that study group came forward with a comprehensive plan for the entire drainage basin. The plan was not aimed at Plaintiffs' property. The County acted upon these recommendations, enacting Ordinances 88–53 and 88–62. The Ordinances similarly were comprehensive, applying to all property for miles around the Lake Jackson drainage basin. The Ordinances did not single out Plaintiffs' property. After enactment of the Ordinances, the RM–3 zoning on Plaintiffs' property permitted development below the 100 foot contour line inconsistent with the Ordinances. The County initiated rezoning of the property to correct that inconsistency. Plaintiffs' permits were conditional, and expressly stated that commencement of construction would be at their risk since rezoning was in progress. None of these facts give rise to an intent to discriminate against Plaintiffs.

On the undisputed facts of record, Plaintiffs have not shown irrationality or a stark pattern of differing treatment of the several developments cited either. Lake View Acres is potentially the most like Plaintiff's development since it is on Lake Jackson near Plaintiffs' proposed development [192] and is a multi-unit development. But it is a single family development, not multi-family, and 95% of the development is above the 100 foot contour line. Further, more than one-half of the land has been designated a permanent conservation easement as a forested buffer between the development and Lake Jackson. Lake View Acres is not similarly situated to Plaintiffs' proposed development.

The same is true with respect to the Waccamaw Center development. This development is much farther away from Lake Jackson than Plaintiffs' 12.96 acres, and it is at a much higher elevation. Further, it sends its storm water to a different storm water retention system. It has not been shown to be similarly situated with Plaintiffs' development.

**192.** Lake View Acres apparently sends some of its storm water drainage to the holding pond on Plaintiffs' land, and thus must be quite close.

The Eye Care Center is even less like Plaintiffs' development than the Waccamaw Center. It is at the 150 foot elevation, is much farther from the Lake shore than Plaintiffs' development, and was only a renovation of an existing commercial building that is much smaller than Plaintiffs' proposed development.

The Hartsfield Law Firm building is located close to Plaintiffs' proposed development near the shore of Lake Jackson. The only activity concerning this building, however, which is not a multi-family development on many acres (it was a private residence) is that the County permitted the owner to replace a septic tank. Thus, this site is not similar to Plaintiffs' proposed multi-family development. The Colson Building is on the same footing as the Hartsfield Law Firm building. There is no evidence that its commercial by-products have escaped to pollute the Lake, and the only activity is the replacement of an existing septic tank.

The County's work on the existing boat ramp has no similarity at all to a multi-family development. Such work was only temporary, and did not result in permanent buildings on a number of acres close to the water's edge.

The multi-family development on Little Lake Jackson developed by Pennington and Wilson (Sombra Del Lago), and the 158 unit development on Little Lake Jackson by Killearn Properties, are the only properties shown by Plaintiffs to have some similarity to Plaintiffs' proposed development since both are multi-family developments. But neither is on Lake Jackson. Both are on Little Lake Jackson. The undisputed evidence in the record is that Little Lake Jackson is connected to Lake Jackson only periodically.

With regard to disturbance of the land, the Sombra Del Lago townhouses had fill dirt deposited below the 100 foot contour, but there is no evidence that buildings or parking lots are below the 100 foot contour. The only evidence as to the Killearn Properties development is that it was constructed without a storm water facility. There is no evidence as to the location of the buildings in relation to elevations or distances from the edge of Little Lake Jackson.

The evidence concerning the County's decisions under the Ordinances with respect to the Sombra Del Lago and Killearn Properties developments also falls short of raising any reasonable inference of intentional discrimination. Since Little Lake Jackson is only periodically connected with Lake Jackson, storm water flowing from these developments into Little Lake Jackson would have only an intermittent potential of reaching Lake Jackson. That fill dirt was allowed below the 100 foot contour line with respect to the Sombra Del Lago development is of little comparative relevance to Plaintiffs' proposed development. Plaintiffs' proposed development is not aimed at placing fill dirt below the 100 foot contour; Plaintiffs intend to place buildings there. Further, there is no evidence that either the Sombra Del Lago or Killearn Properties developments have buildings or parking lots below the 100 foot contour line.

In sum, the developments cited by Plaintiffs are not sufficiently similar to give rise to any reasonable inference that the decision not to permit multi-family development on Plaintiffs' 12.96 acres was motivated by intentional discrimination against Plaintiffs. The distinctions between the Sombra Del Lago development, the Killearn Properties development, and all of the other developments cited by Plaintiffs, and Plaintiffs' proposed development, are clearly rational.

The rationality of those distinctions, and the lack of an inference of intentional discrimination as to the denial of permission to build multi-family units on the 12.96 acres, is even more apparent when the entire history of Plaintiffs' development is recalled. Of the 165 original acres, Plaintiffs have been permitted to develop all but this remaining 12.96 acres. They promised not to build below the 105 foot contour line and to build substantially above the edge of the holding pond dikes. A reasonable inference that the County intentionally discriminated against Plaintiffs in the denial of permits to construct their multi-family development on the 12.96 acres at issue does not exist on these facts. Defendant is entitled to summary judgment in its favor as to Count IV for these reasons.

## V. Whether as to Counts II Plaintiffs have shown that the County's actions were arbitrary and capricious

Count II claims an arbitrary and capricious denial of substantive due process. The claim fails, as discussed above, for lack of a due process property interest. An alternative ruling is not needed if a federally protected interest is lacking. *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1374 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1400, 128 L.Ed.2d 73 (1994). An alternative ruling is provided here given the complexities of the "property interest" ruling and since it has been fully briefed by the parties.

This substantive due process claim challenges Ordinances 88–53 and 88–62, the 1989 rezoning Ordinance, and the County's refusal to permit the development. Thus, the claim is both a facial challenge to the Ordinances and an "as applied" challenge for refusal to grant exceptions.

 As to the facial challenge, absent a fundamental interest, a "statute will not violate the Due Process Clause if it is rationally related to a legitimate government interest." *Parks v. City of Warner Robins, et al.,* 43 F.3d 609, 615 (11th Cir.1995). *See also Holmes v. U.S.,* 868 F.Supp. 1348, 1354 (M.D.Ala.1994).[193] "[Z]oning regulations will not be declared unconstitutional as violative of substantive due process unless they 'are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.'" *Corn, supra,* 997 F.2d at 1375 (citations omitted).[194] "A regulation rationally related to a legitimate government purpose under equal protection will almost always meet the rational basis test of due process." *Alamo Rent-a-*

*Car v. Sarasota–Manatee Airport Authority,* 906 F.2d 516, 523 (11th Cir.1990), citing *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 470 n. 12, 101 S.Ct. 715, 727 n. 12, 66 L.Ed.2d 659 (1981).

 The Ordinances challenged here meet this test, as discussed above with respect to the facial equal protection claim. Thus a facial arbitrary and capricious substantive due process claim fails. The "as applied" claim fails for the same reasons discussed above. The evidence to attempt to show that the County acted arbitrarily and capriciously when it refused to grant exceptions under the Ordinances is that discussed above with regard to other developments. A rational distinction between those developments and Plaintiffs' development, particularly as it was promised in 1972, exists. Thus, Defendant is entitled to summary judgment as to Count II for this additional reason.

## VI. Whether as to Count III Plaintiffs have shown that their property was "taken" in violation of substantive due process

This due process claim, like the one in Count II, fails for lack of a property interest arising from Florida principles of equitable estoppel. Since the claim of a taking of all economic uses of the property with regard to Count III was previously dismissed, this ruling results in judgment in favor of Defendant as to this claim.

 Alternatively, the following is noted. Both parties cite *Reahard v. Lee County,* 968 F.2d 1131 (11th Cir.), *supplemented,* 978 F.2d 1212 (1992), *rev'd on other grounds,* 30

---

193. "The School Board's rule is endowed with a presumption of legislative validity, and the burden is on respondent to show that there is no rational connection between the Board's action and its conceded interest in providing its students with competent, well-trained teachers." *Harrah Independent School Dist. v. Martin,* 440 U.S. 194, 198, 99 S.Ct. 1062, 1064, 59 L.Ed.2d 248 (1979).

194. The issue, at least with respect to a facial challenge, is probably not the actual reasons advanced for the legislation, but whether the County could have had a legitimate reason for its

decision. *Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1234 (9th Cir.1994). *Cf. F.C.C. v. Beach Communications, Inc., supra.* "[A] federal court is without authority to weigh and reappraise the factors considered or ignored by the legislative body in passing the challenged zoning regulations." *Corn,* 997 F.2d at 1389 (citation omitted). *Corn* examined actual motives, 997 F.2d at 1386, however, to determine if any rational basis supported the governmental body's decision, and this court will do likewise. Actual purposes are often useful in determining whether any conceivable rational basis exists.

F.3d 1412 (1994),[195] as establishing the law for this claim. *Reahard,* concerned a just compensation taking claim, not a due process takings claim. 968 F.2d at 1135, 30 F.3d at 1415 and n. 7. In the absence of further guidance, the court will apply the *Reahard* guidance to this due process takings claim.

*Reahard* held that a claim that the landowner has been denied "all or substantially all economically viable use of his property" requires analysis of "the extent to which the regulation has interfered with investment-backed expectations." 968 F.2d at 1136. Among the relevant questions to answer with respect to this issue is the history of how the land was zoned, the present nature and extent of the property, and the "reasonable expectations of the landowner under state common law." *Id.* As discussed above, the present nature and extent of the land is 12.96 acres, all but 0.43 of which are below the 105 foot contour line. The land was rezoned upon Plaintiff's promises not to develop it below the 105 foot contour line, and to build substantially above the holding ponds. Thus, Plaintiffs had no reasonable expectations of development below the 105 foot contour line, or to build up to the edge of the holding ponds. Their due process takings claim fails for this additional reason.

## VII. Count V, inverse condemnation

In February 1993, the court abstained from consideration of a portion of this pendent state claim to permit a pending state court suit to decide the issues. The status of that case, and the effect of this order on Count V, has not been argued by the parties. An opportunity to do so will be afforded by this order.

Accordingly it is ORDERED that:

1. Defendant's motion for summary judgment as to standing, doc. 308, is GRANTED as to Villas of Lake Jackson, Ltd., but is DENIED as to the other Plaintiffs.

2. Defendant's motion for summary judgment, doc. 310, as to the merits of Counts II, III, and IV, is GRANTED. After Count V has been resolved and the case concluded, the Clerk will be directed to enter judgment in favor of Defendant on those Counts.

3. The parties shall file memoranda concerning the status of Count V on or before February 24, 1995.

4. Discovery is STAYED until the question of the viability of Count V has been resolved. Ruling on pending motions concerning discovery will be deferred until then.

5. The trial scheduled by doc. 375 is CANCELLED.

6. The Clerk shall return this file to me on February 27, 1995.

DONE AND ORDERED.

---

**195.** The last *Reahard* decision held that because Florida provides a judicial remedy for a just compensation takings claim, such a claim is not ripe for federal court review until the state judicial remedy has been exhausted.